916 A.2d 991

**Mikhail VOLODARSKY**

v.

**Kira TARACHANSKAYA.**

**No. 50, Sept. Term, 2006.**

Court of Appeals of Maryland.

Feb. 9, 2007.

John J. Condliffe (Angela J. Silverstein, Shub-Condliffe & Condliffe, P.A., Towson, Samuel A. Seidler, Pikesville, Thomas A. Pavlinic, Law Office of Thomas A. Pavlinic, Annapolis, all on brief), Harry B. Siegel (Kristine Lea, Law Offices of Harry B. Siegel, Columbia, on brief), for petitioner.

John Carroll Broderick (Hodes, Ulman, Pessin & Katz, P.A., Towson, on brief), Nicole E. Ames (Hodes, Ulman, Pessin & Katz, P.A., Columbia, on brief), for respondent.

Kambon R. Williams, Baltimore, amicus curiae.

Argued before BELL, C.J., RAKER,*WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Maryland Code, § 9–101 of the Family Law Article (FL) requires, in any custody or visitation proceeding, that, if the court has "reasonable grounds to believe" that a child has been abused or neglected by a party to the proceeding, the court must determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to that party. The statute goes on to state that, unless the court specifically finds that there is no likelihood "of further child abuse or neglect by the party," the court must either deny custody or visitation rights to that party or approve a supervised visitation arrangement that assures the safety and physiological, psychological, and emotional well-being of the child.

In this custody and visitation case emanating from the Circuit Court for Baltimore County, conflicting evidence was presented as to whether the father of the child had, in some

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

way, sexually abused the child. Judge Cox, after considering that evidence and making certain credibility determinations, announced that she was not persuaded by a preponderance of the evidence that the father had abused the child, although, for other reasons not contested in this appeal, she granted custody to the mother and established a supervised visitation arrangement for the father. In an appeal by the mother, the Court of Special Appeals held that Judge Cox erred in applying a preponderance standard in weighing the evidence of abuse. It concluded that the statute requires only "reasonable grounds to believe" that abuse occurred, and that a determination of reasonable grounds does not require that the court believe it more likely than not that the abuse occurred. *See Tarachanskaya v. Volodarsky*, 168 Md.App. 587, 897 A.2d 884 (2006). The Court of Special Appeals was wrong.

## BACKGROUND

We would be overly kind to the parents if we characterized this most unfortunate case, with charges and counter-charges of physical and sexual child abuse, simply as bitter and hotly contested. Both of them are emigres from Russia. The mother, Kira Tarachanskaya, came to the United States with her husband, Alex, and their pre-teen son, Arthur, in August, 1996. In November, 1997, she and Alex separated. The separation was accompanied by her seeking a domestic violence protective order against Alex, accusing him of being abusive to Arthur. It is not clear what happened with that case.

Ms. Tarachanskaya then commenced an extra-marital affair with Mikhail Volodarsky. In March, 1998, she and Arthur moved in with Volodarsky, and not long thereafter, she became pregnant with Greta, the subject of this case.[1] The couple argued over whether Kira should terminate the pregnancy, which she wanted to do, and they eventually separated. As she did upon separating from her husband, Kira sought a

---

1. For convenience, we shall henceforth refer to the parties as Kira and Mikhail.

domestic violence protective order against Mikhail, based on complaints of threatening conduct. A protective order was issued, apparently by consent. Greta was born in January, 1999. Kira then reconciled with Alex, and she, Arthur, and Greta have since remained in that household.

This litigation began in March, 1999, when Mikhail filed a complaint seeking joint legal custody of and liberal visitation with Greta.[2] He complained that Kira had consistently failed to permit reasonable visitation. Kira answered and filed a counter-complaint for custody, in which she alleged that Mikhail had engaged in a pattern of abusive behavior and threats toward her, her mother, Arthur, and Greta (prior to her birth), that the protective order issued by the District Court in September, 1998, had directed him not to abuse or make any attempt to contact them, and that she was in fear for the safety of Greta if the child were left in Mikhail's care. It appears that, pending a hearing, the parties reached an interim agreement for visitation by Mikhail, which the Circuit Court ultimately found was "honored more in the breach, as [Kira] resisted any contact between the father and the child."

At the custody hearing that occurred before Judge Cox in September, 1999, the evidence demonstrated that Kira was distrustful of Mikhail and evaded all efforts at contact. She hid the fact of Greta's birth from Mikhail and resisted even brief periods of supervised contact. Mikhail, on the other hand, had limited parenting skills and no experience in caring for an infant. Because the parties had shown no ability to co-parent, the court awarded sole legal and physical custody of Greta to Kira, subject to bi-weekly visitation for two-hour periods at Mikhail's apartment, with a friend or relative present to facilitate the drop-off and supervise the initial part of the visit, and to a review in 90 days to consider increased access. Both parents were ordered to participate in parenting classes, and a home study was requested.

---

**2.** Although Kira's last name was Tarachanskaya and Mikhail's last name was Volodarsky, the child was given Kira's mother's last name, Tonkonogaya.

The home study confirmed a "significant level" of conflict, distrust, and retaliation between the parties. It noted Kira's continued resistance to unsupervised visitation and Mikhail's lack of objectivity in assessing his parenting skills and his resentment over the restrictions on access to Greta. The report recommended a gradual increase in visitation and enhanced parenting skill classes for Mikhail. After a review hearing in January, 2000, an agreement was reached to increase weekend visitation to include an overnight on Fridays. In June, 2000, Kira sought to have Mikhail held in contempt for failure to pay child support. Mikhail filed petitions to reduce the child support and to have Greta's last name changed to Volodarsky. Apparently, Kira was not notified of the name-change petition, which was nonetheless granted.[3] Mikhail was held in contempt, arrearages were assessed, and some minor changes were made to the support order.

Tensions continued to escalate during the Fall of 2000. Kira complained that Greta returned from visits hungry, bruised, and smelling of smoke. On one occasion, in October, Greta returned with a bruise on her thigh; Kira took her to the hospital, which led to an investigation by the Department of Social Services (DSS). While that was pending, Kira refused to allow any visitation, which resulted in a contempt petition by Mikhail. The court ordered interim supervised visitation. Following a hearing in December, the court found no evidence of physical abuse and ordered a resumption of visitation. The parties submitted an agreed visitation schedule, which, in February, 2001, the court approved.

In September, 2001, Mikhail filed a *pro se* petition for an *ex parte* protective order, alleging physical abuse of Greta by Alex. That proceeding is not in the record before us, but Judge Cox later determined that the petition had been dismissed by a different judge because of "a lack of familial

---

**3.** There is no reference in the docket entries in this case to the petition or any proceeding dealing with the name-change, and from the comments made later by Judge Cox, it would appear that she was not involved. We assume that the petition was filed as a separate action and was presented to a different judge.

relationship between the parties." In February, 2002, Mikhail contacted DSS and charged Alex with sexually abusing Greta. In April, Kira filed a complaint with DSS charging Mikhail with sexually abusing Greta and, at the same time, again unilaterally suspended all visitation. That produced a contempt petition and a motion by Mikhail to modify visitation and a counter motion by Kira alleging sexual abuse by Mikhail.

A hearing on the contempt petition took place in June, 2002, again before Judge Cox. By then, the DSS investigation of both abuse complaints had been completed. The DSS report "ruled out" abuse by Alex and concluded that the allegation of abuse by Mikhail was "unsubstantiated." [4] The report stated that the repeated allegations of abuse and neglect made by both parents "are clearly not in the best interest of Greta" and recommended that independent counsel be appointed for the child. Following the hearing, Kira was found in contempt for terminating the court-ordered visitation. Pending a modification hearing, overnight visits with Mikhail were suspended, and, to eliminate the potential for further unsubstantiated claims and to reduce the level of distrust, the court required that a woman be present at visits. The court ordered counseling services for Greta and psychiatric evaluations of the parents by the Court Psychiatrist.

The psychiatric report was delivered to the court in November, 2002. It found nothing in Mikhail's history to question his fitness as a parent and, although identifying slight depression and somewhat obsessive qualities, found no evidence of significant psychopathology that would warrant individualized treatment. The report stated that Kira had "little insight into

---

**4.** There are three possible findings that can arise from an investigation of alleged child abuse or neglect—indicated, ruled out, or unsubstantiated. "Indicated" means "a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." FL § 5–701(m). "Ruled out" means "a finding that abuse, neglect, or sexual abuse did not occur." FL § 5–701(w). "Unsubstantiated" means "a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out." FL § 5–701(y).

her part in the current situation" but saw all of the difficulties as related to Mikhail. It described her as "manipulative to get her own way" but found nothing to suggest that she was unfit and no significant psychopathology. The report found from the history of the case that Kira's "use of the Courts will continue" and that her behavior in that regard was "detrimental to the child." The Court Psychiatrist, noting that both parents had begun videotaping their interactions with the child, recommended joint counseling services for the parents and that Greta's attorney evaluate all claims made by either parent.

Greta's attorney attempted to arrange an independent assessment and counseling for the child, but the effort was complicated by the fact that, though three years of age, Greta did not speak English. Once again, an interim custody and visitation arrangement was agreed to by the parties and confirmed by the court. Overnight visitation with Mikhail was to resume, joint counseling of the parents was to begin, the parties agreed to stop taping their interactions with the child, and Greta was to be enrolled in a pre-school program so that she could learn English. Trial was postponed until May, 2003.

In December, 2002, Kira's attorney withdrew his appearance. Although Kira was informed of a status conference scheduled in April and the need for her to attend, she failed to appear. The court advised her by mail of the need to obtain counsel or appear personally at all scheduled proceedings, including the trial that was set for the end of May. Kira appeared without counsel on the first day of trial but, following a chambers conference, left the courthouse and did not return. The trial, before Judge Cox, proceeded in her absence. The court heard from Dr. Robert Snow, the clinical social worker who conducted an evaluation and counseling of Greta at her attorney's request and received input from the attorney. In his written report, Dr. Snow observed that both parents were competing for custody of Greta and had placed her in a "loyalty conflicted position." He concluded that further investigation of child sexual abuse was not indicated

"as Greta does not behaviorally present symptoms of sexual abuse and both parents have rescinded their belief in such."

Based on the evidence taken at the hearing, Judge Cox, in an order entered in June, 2003, awarded legal custody to Mikhail and split physical custody "on a 4/3 schedule, alternating weeks, with a shared holiday schedule." As Judge Cox subsequently noted in the memorandum opinion at issue in this appeal, "[a]lmost immediately after the modified custody Order was entered, [Kira] appeared in District Court for Baltimore County in Catonsville and filed an *Ex Parte* Domestic Violence Petition seeking relief on behalf of her daughter, based upon allegations of sexual abuse by [Mikhail]." The District Court entered a temporary protective order, referred the matter to DSS for investigation, awarded interim custody to Kira, and entered a no-contact order with respect to Mikhail. Based on a joint motion by Mikhail and Greta's attorney, the domestic violence case was transferred to the Circuit Court and set for hearing before Judge Cox. After hearing testimony from Kira, her witness, and witnesses from DSS and the police department, Judge Cox denied the protective order.

Visitation continued in accordance with the established schedule until March, 2004, when Kira, through new counsel, filed another domestic violence petition alleging essentially the same sexual abuse of Greta by Mikhail that had previously been alleged. This petition was filed in the Circuit Court, but, notwithstanding that Judge Cox had been presiding over the custody and visitation proceedings, that Greta had been represented by counsel since July, 2002, and that Mikhail also had counsel of record, the petition was presented to another judge and no notice to counsel of record was given. Their first awareness of the proceeding was their receipt of an interim protective order signed by the other judge. When this came to light, the matter was transferred to Judge Cox, who conducted a hearing on March 29. It was then agreed, through counsel, that Greta would commence regular psychotherapy sessions with Dr. Snow, that the psychologist newly retained by Kira's attorney, Dr. Joyanna Silberg, would con-

duct a separate evaluation of the sexual abuse allegations, which she felt had not been adequately addressed, and that visitation would continue pursuant to the June, 2003 order.

At the initial assessment meeting with Drs. Snow and Silberg, Greta made more graphic sexual disclosures and exhibited significant distress when in Mikhail's presence, in contrast to her earlier behavior. Upon the recommendation of Drs. Snow and Silberg, Kira then sought to suspend all visitation. An emergency hearing was scheduled, but just before that hearing Mikhail, through counsel, agreed to suspend visitation voluntarily based on the therapists' recommendation until the sexual abuse investigation was completed.

Dr. Silberg completed her investigation and prepared a report in July, 2004. She recounted a variety of disclosures by Greta regarding sexual abuse by Mikhail and concluded that the child's ability to describe those events "was of such clear detail, that it is impossible to imagine a source for this other than direct experience with sexual events of this type." Dr. Silberg's ultimate conclusions were that Greta was very frightened of her father, the child's description was "so vivid and accurate that only real experience could produce these reports," Kira was not coaching the child but had acted in Greta's best interest, Mikhail was not credible, his behavior fit the pattern of ex-partners who use intimidation to frighten ex-spouses, on-going contact between Greta and Mikhail would be psychologically and potentially physically dangerous to the child, and Greta suffered from post-traumatic stress disorder and would protest any visitation with Mikhail.

In light of this report, the court placed Greta temporarily in the physical custody of Kira, suspended visitation with Mikhail, and ordered that Greta remain in counseling, all pending trial on the merits. A copy of Dr. Silberg's report was sent to DSS, which prompted a new investigation by Rosalind Dizard, of its Family Crimes Unit. Ms. Dizard issued her report in January, 2005, and came to a very different conclusion than Dr. Silberg. She "ruled out" any abuse by Mikhail and concluded that "parental alienation is the primary dynamic

within this family system and that it is more likely that [Greta] was not sexually abused by [Mikhail]."

Judge Cox conducted a six-day trial in the matter commencing in February, 2005 and extending into March and May of that year. Kira was represented by counsel. Judge Cox heard testimony from Dr. Snow, Dr. Silberg, Ms. Dizard, and Mikhail, and in July, 2005, filed a 28–page memorandum opinion setting forth the history of the case, a discussion of the expert opinions, and her findings and conclusions. She noted that the specific disclosures by Greta clearly indicated sexual knowledge or exposures well beyond the normal or appropriate range of experience for a young child and that the manner in which the child expressed herself did not tend to suggest coaching. Judge Cox also observed that the manner of expression, inconsistencies in the child's reporting, and different impressions formed by the experts had led them to reach "very different conclusions concerning the strength of the evidence that sexual abuse occurred, or the identification of the perpetrator of any such abuse." The judge then summarized the testimony and conclusions of Dr. Silberg, Dr. Snow, and Ms. Dizard and recorded her own impressions and conclusions.

Dr. Silberg's ultimate conclusion was that Greta had been sexually abused and that, although it was possible that someone other than Mikhail was responsible, it was far more likely that Mikhail had committed the abuse. She found Kira to be responsive and protective of Greta and Mikhail to be manipulative, too confident, and inconsistent, and she attributed Greta's fear of her father to sexual abuse committed by him. Judge Cox found it noteworthy that Dr. Silberg's initial report, in which she reached those same conclusions, was based solely upon a review of records and discussions with Kira, notwithstanding Dr. Silberg's acknowledgment of the importance of interviewing the child prior to making an assessment, and that her initial impression of the abuse allegations was formed without direct access to Greta.

Dr. Snow, a psychologist having extensive experience with child trauma victims, had a different impression. Initially contacted by Greta's counsel, he met with both parents in 2002 and was advised in that first conference that neither believed that sexual abuse had occurred. From his early evaluation, Dr. Snow felt that there were high levels of anxiety and loyalty conflicts between the parents as Greta sought their approval and did not believe that further investigation of sexual abuse was warranted. During subsequent counseling sessions with the parents in 2003, Kira did not express any renewed concern regarding abuse or Greta's behavior. Mikhail, on the other hand, did express concern that Greta did not act naturally with him in Kira's presence and would not openly display affection if her mother was there.

The first suggestion of renewed concern about abuse came after the March, 2004 *ex parte* protective order proceeding, at which time Greta did make specific disclosures of a sexual nature, which Dr. Snow found were conveyed "in a programmed and pressurized manner." Summarizing Dr. Snow's testimony, Judge Cox noted his impression that Greta did not appear emotional in relaying the allegations "but was more focused on getting the story out." Dr. Snow found it significant that Greta expressed concern over losing her mother and only being allowed to see her father. She expressed "extreme alliances, relegating everything associated with her father as bad and her mother as good," leading Dr. Snow to believe that "Greta would do what she believed necessary to be with her mother" and that the child "had discovered that sexual abuse disclosures elicit strong reactions." Significantly, Dr. Snow found that Greta had been exposed to sexual material, but he was not convinced that she had been the victim of sexual abuse.

Ms. Dizard, a clinical social worker with DSS, also had extensive investigative and work experience with victims of sexual abuse. She conducted an independent interview of Greta at her school. Greta initially made no disclosures of abuse, but, as described by Judge Cox:

"Her disclosures to Ms. Dizard only came after 'Dr. Joy's' name was introduced, and Greta recognized this as a reference to Dr. Silberg, whom Greta characterized as 'mommy's friend.' Greta then indicated that she had to tell Ms. Dizard a story, and began to disclose things that happened to her with 'another daddy.' While she disclosed digital penetration, she did not describe other sexual contact, and she also did not provide consistency or the level of detail conveyed to Dr. Silberg."

Consistent with the view of Dr. Snow, Ms. Dizard saw Greta's loyalty as clearly with Kira, and, although she believed that the child "had been exposed to something of an inappropriate sexual nature," she concluded that the allegations of sexual abuse by Mikhail "were ruled out."

Judge Cox found it difficult to reconcile the conflicting expert opinions. She stated that, "[o]verall, the Court is persuaded that this child has been exposed to sexual behavior," but that "[t]he Court is not, however, convinced by a preponderance of the evidence that Greta has been the victim of sexual abuse, or that her father has perpetrated sexual abuse." Judge Cox then set forth the reasons why she was not so convinced. She began by observing that Greta had been "enmeshed in high levels of parental conflict since the day she was born" and that conflicting allegations of physical and sexual abuse had been made by both parents. She found it noteworthy that the significant and detailed abuse allegations occurred after the 2003 change in custody and that they were "accompanied by the child's expressions of fear of losing her mother, rather than concerns relating to continued abuse by her father." Once Greta made disclosures, "there was an immediate alliance with her mother, to the complete exclusion of her father, in sharp contrast to what occurred before."

Judge Cox found persuasive as well the fact that the initial abuse claim had been made by Mikhail against Alex and believed it inconceivable that he would initiate a sexual abuse investigation at a time when he himself was sexually abusing the child. Another factor weighing in the judge's conclusion

was "the lack of documented symptomology that the child has been a victim of abuse." Although Dr. Silberg found Kira to be a credible source of information, Judge Cox observed that, over the six-year history of the case, "there have been numerous occasions when I have found [her] fears and projections to be without basis...." Finally, Judge Cox noted the lack of detail in disclosures made to Ms. Dizard, once Greta had been removed from the tension between her parents for some period of time. "For all of these reasons," she stated, "I simply do not find, based upon a preponderance of the evidence, that [Mikhail] has sexually abused his daughter."

Notwithstanding that finding (or lack of finding), Judge Cox recognized that she was dealing with a child who, at the time, was totally alienated from her father, which constituted a change in circumstances since the last (2004) custody order. Given that the parents were unable to communicate or reach shared decisions, joint custody was not an option. The court therefore entered an order placing Greta in the legal and physical custody of Kira, requiring Greta to continue in regular therapy with a goal of providing a plan to repair the damage to her relationship with Mikhail, requiring both parents to participate in counseling to reduce parental conflict, and precluding visitation with Mikhail other than in a therapeutic setting.

Kira appealed, complaining, among other things, that based on the weight of the evidence at trial, the trial court had reasonable grounds to believe that Greta had been sexually abused by Mikhail and that the court abused its discretion in not making that finding. In support of that complaint, she argued that the trial court, in using a preponderance of the evidence standard of proof, applied the wrong burden. That argument resonated with the Court of Special Appeals, which regarded a preponderance standard as more stringent than "reasonable grounds to believe." Under what it regarded as settled case law, the appellate court concluded that "[n]o logical reason exists, in light of the explicit language of § 9–101, for us to uphold application, by the lower court of the more stringent standard." *Tarachanskaya v. Volodarsky,*

*supra,* 168 Md.App. at 609, 897 A.2d at 897. It vacated the Circuit Court judgment and remanded the case for the trial court to "reassess the evidence to discern if that evidence satisfies the lower threshold of reasonable grounds to believe that Greta was sexually abused by [Mikhail], pursuant to § 9–101." *Id.*

## DISCUSSION

The fundamental error committed by the Court of Special Appeals was in regarding "reasonable grounds to believe"—the statutory language—and preponderance of the evidence as different standards of proof, one more stringent than the other. In the context of FL § 9–101, they are not.

The two subsections of § 9–101 must be read together. Subsection (a) requires that, if, in a custody or visitation proceeding, the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court must determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party. Subsection (b) then states the consequence of the court's determination that reasonable grounds for such a belief exist. In that event, the court must deny custody or visitation, except in a secure, supervised setting, unless it specifically finds "that there is no likelihood *of further abuse or neglect by the party."* (Emphasis added). To require a specific finding that *"further* abuse or neglect" is not likely clearly implies that there must be some sort of finding or determination by the court that abuse or neglect likely occurred in the first instance. The question is whether, *at a minimum,* that finding must be made by at least a preponderance of the evidence.

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Supreme Court set forth the function of a standard of proof and explained the three standards that exist. Quoting in part from Justice Harlan's concurring opinion in *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368, 379 (1970), the *Addington* Court observed:

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' "

*Addington, supra,* 441 U.S. at 423, 99 S.Ct. at 1808, 60 L.Ed.2d at 329.

The Court then explained that three standards of proof existed. At one end of the spectrum—the low end—is the typical civil case involving a monetary dispute between private parties, the outcome of which is of minimal concern to society. In those cases, the plaintiff's burden is "a mere preponderance of the evidence," under which the litigants "share the risk of error in roughly equal fashion." *Id.* In a criminal case—the high end—the interests of the defendant "are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* That, the Court observed, is accomplished by requiring as a matter of due process that the State prove guilt beyond a reasonable doubt. The intermediate standard, of clear, cogent, or convincing evidence, is used in cases, such as fraud, quasi-criminal wrongdoing, or "to protect particularly important individual interests in various civil cases" where the interest at stake is "deemed to be more substantial than mere loss of money." *Id.* at 424, 99 S.Ct. at 1808, 60 L.Ed.2d at 330. *See also Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Santosky v. Kramer,* 455 U.S. 745, 754–55, 102 S.Ct. 1388, 1395–96, 71 L.Ed.2d 599, 607 (1982).

Notably, and understandably, a standard of proof *lower* than "a mere preponderance" was not even contemplated by the Supreme Court in any of those cases. It defies logic and reason to permit a court to make what is essentially a finding of fact, especially one that may lead to the deprivation of a Constitutionally-based right of access to one's child, when the court is unable to find, even by the slimmest margin, that the

fact is more likely so than not. How can a court have reasonable grounds for it to believe that an act occurred if it is not persuaded, from whatever evidence is properly before it, that the act more likely occurred than not? Under the Court of Special Appeals rationale, a court could find reasonable grounds to believe that which, in its own mind, it does not believe because, in its view, the credible evidence does not support the fact, and that strikes us as the antithesis of reasonableness.[5]

A finding of reasonable grounds to believe can involve either or both a subjective or objective analysis, depending on what is at issue and what the function is of that finding. In a case tried by a jury, where it is the jury that must determine the ultimate facts, a judge considering a motion for judgment engages in a purely objective analysis. The judge does not make credibility determinations and does not weigh the persuasive value of the evidence, for that is not his or her task. The judge looks only to whether the evidence in support of the party with the burden of proof is legally sufficient to permit a rational jury, if *it* credits that evidence, to find for that party.

A similar kind of objective analysis is most often used in situations in which only a preliminary determination need be made, based on incomplete and often non-testimonial hearsay evidence. When faced with making a determination of probable cause to justify an arrest or search warrant, for example, the issuing magistrate usually takes the affidavit offered in support of the application at face value and determines only whether the facts alleged are legally sufficient to establish probable cause. The magistrate is normally not required to make ultimate credibility determinations or weigh the ultimate persuasiveness of the averments in the affidavit and, unless the application or documents offered in support of the applica-

---

5. We are not asked in this case to address, and we do not address, whether, under the principles set forth in *Addington, Mathews,* or *Santosky,* a standard higher than preponderance might be required where the effect of the finding might be to deny a parent all right of visitation with his or her child and must be, at a minimum, to place significant limits on such visitation.

tion are deficient or suspiciously ambiguous, usually has no basis for doing so. The magistrate asks whether, assuming the averments are true, they are legally sufficient to justify the warrant.

In a case like this, however, where ultimate factual decisions are made by a judge based on conflicting testimonial evidence, the judge must apply a subjective analysis as well, and, indeed, the subjective analysis may, in large measure, govern the objective analysis. If, for example, all of the evidence bearing on Fact X comes from two witnesses and the judge hearing the testimony credits the testimony of Witness 1 that supports and is legally sufficient to support Fact X and does not credit the testimony of Witness 2 that negates Fact X, the judge will have reasonable grounds for believing Fact X to be so, precisely because the judge will believe, by at least a preponderance of the evidence, that Fact X is more likely so than not. Another judge, who hears the same evidence but credits Witness 2 rather than Witness 1, will come, quite appropriately, to an opposite conclusion. That judge will *not* have reasonable grounds to believe that Fact X is so because the judge will be unable to find by a preponderance of the evidence that it likely *is* so. The issue is not whether some other person or entity could reasonably believe Fact X to be so, but whether that court, from the evidence presented in that proceeding, has reasonable grounds to believe it is so.

That is essentially what happened here. Although Judge Cox was not called upon to determine whether Mikhail had, in fact, abused Greta, she was required to determine whether she had reasonable grounds to believe that he did. Given the statutory function and effect of that determination, however, it became, *for purposes of § 9–101,* a finding of ultimate fact. The mere finding of reasonable grounds to believe the allegation of abuse would automatically trigger the need to make a further finding that could result in a total or partial denial of access to Greta. In order to make that initial, critical determination, Judge Cox was required to, and did, sift through the conflicting evidence, make credibility determinations, and determine the ultimate persuasiveness of the evidence bearing

on the allegation of abuse. After going through that process, she declared that she was not persuaded that Greta had been abused by Mikhail. That necessarily means that she was unable to find reasonable grounds for believing that such abuse occurred.

When examined in this manner, there is no conflict between the preponderance standard and the reasonable ground determination required by § 9–101. It is by using the preponderance standard that the judge determines whether reasonable grounds exist. Section 9–101(a) does not purport to create some cosmic ethereal standard of reasonable grounds to believe that is detached from the persuasive value of the evidence admitted on that issue, nor, as a practical matter, could it do so. The statute requires further findings only "if *the court* has reasonable grounds to believe" that a child has been abused or neglected. (Emphasis added).

Both parties have alluded to the legislative history of § 9–101, and we have examined that history. We are not persuaded that it compels, or even would support, a different result.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.