REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0047

September Term, 2014

_____

MICHAEL GERALD D.

v.

ROSEANN B.

_____

Krauser, C.J.,
Nazarian,
Leahy,

JJ.

_____

Opinion by Krauser, C.J.

_____

Filed:  December 17, 2014

The principal issue presented by this appeal is whether a court must, before denying a noncustodial parent all visitation with his or her minor child, under section 9-101 of the Family Law Article ("FL"),[1] find that that parent had abused or neglected the child in question by "clear and convincing evidence," as appellant demands, or by a "preponderance of the evidence," as the court below declared. Employing the latter standard of proof, the Circuit Court for Anne Arundel County found that appellant, Michael D.,[2] had sexually abused his daughter, Emily. It thereupon awarded custody of Emily to her mother, Roseann B., and denied appellant all right of visitation with his daughter.

Appellant challenges that ruling, claiming, first, that the circuit court should have found that sexual abuse occurred, not by a preponderance of the evidence, but by clear and convincing evidence before denying him all visitation with his daughter; and, second, that the court abused its discretion in declining to order supervised visitation. We hold, however, that the circuit court neither erred in applying a preponderance-of-the-evidence standard nor abused its discretion in refusing to grant appellant supervised visitation.

**Background**

On April 23, 2005, appellant and Ms. B. married. Eight months later, on December 13, 2005, their only child, Emily, was born. When Emily was fifteen months old, the family moved to Annapolis from Virginia, where they lived together for the next five years. During that time, appellant was employed by the Federal Bureau of Investigation, first in

---

[1]     Md. Code Fam. Law § 9-101 (1984, 2012 Rep. Vol.).

[2]     To protect the privacy of the parties' child, we shall not use the parties' last names but, instead, shall refer to them by the first initials of their respective last names.

1

Washington, D.C., and then in Virginia and, due to his long commute, primarily spent time with Emily on weekends.

In June of 2012, when Emily was six years old, Ms. B. separated from appellant, and, with Emily, moved to New Jersey, where Ms. B.'s family lived.[3]  Two months later, Ms. B. filed a complaint, in the Anne Arundel County circuit court, for absolute divorce, seeking sole physical and legal custody of Emily.  The complaint specifically requested that appellant be denied "any visitation with the minor child until" he had undergone "intense counseling for his behavioral issues," though, notably, the complaint did not allege that appellant had abused Emily in any way.

After Ms. B. had filed for divorce in the Anne Arundel County circuit court, she sought, in New Jersey, a temporary restraining order against appellant, alleging that appellant was texting and calling her "50–80 times a day at least 3–4 times a week," conduct that continued notwithstanding her requests that appellant "leave her alone."  A temporary restraining order was issued by a New Jersey court, directing appellant to have no contact with either Ms. B. or Emily.  That order was ultimately followed by a consent order setting forth provisions governing appellant's future contact with both Ms. B. and Emily.  Among other things, the consent order specifically prohibited appellant from contacting Ms. B. with respect to any topic that was not related to Emily.  It further limited appellant to "one initiated communication [regarding Emily] to [Ms. B.] per day," either

---

[3]     Ms. B. had separated from appellant once before, during the summer of 2011, and had taken Emily with her to New Jersey.  At the end of that summer, however, Ms. B. and Emily returned to Maryland, and the couple attempted marriage counseling.

2

by email or text message. And, of particular factual significance to the case before us, it granted appellant "temporary supervised parenting time" at a New Jersey courthouse, where he could see Emily on alternate Saturdays "for no more than two hours." This form of supervised visitation began on September 15, 2012, and continued for the next nine months, until June of 2013.

But only six months after supervised visitation between Emily and appellant had commenced, Emily, in March of 2013, disclosed to her mother, and then to a counselor associated with a therapy program[4] that Emily had been attending, that her father would play "the bug game" with her during his visits with her. Emily said that, during that game, appellant would tickle her, and, in so doing, would touch her chest, vagina, and buttocks, both above and underneath her clothes, while she and appellant sat in the back of the courthouse visitation room. Although there is no dispute that there were video cameras in the visitation room, the parties disagree as to whether those cameras were positioned so that they were able to scan every corner of the visitation room and thus would have recorded the episodes in question. Whatever videotapes there were of appellant's supervised visits with Emily, they were not shown to the circuit court, nor are they part of the record before us.

Both Ms. B. and Emily's counselor subsequently contacted the New Jersey Division of Child Permanency and Protection. Separate investigations by the New Jersey Division and the Maryland Department of Social Services into Emily's allegations followed, and

---

[4] Ms. B. described this therapy program, at trial, as one geared toward children who had experienced or witnessed domestic violence within their families.

3

appellant's supervised visitation continued without interruption. The New Jersey investigation ultimately found that the allegations were "unfounded," while the Maryland investigation "ruled out" "neglect" (but did not address sexual abuse). Although neither of the final reports of the two state investigations is part of the record before us, a "Notice of Investigation Closing" indicating that the Maryland Department had ruled out "neglect" was admitted into evidence at trial and is part of the appellate record.

In June of 2013, Ms. B., after learning that the Federal Bureau of Investigation (appellant's employer at the time) had issued a "Be On The Lookout" notice for appellant, obtained a New Jersey court order suspending appellant's supervised visitation with Emily. That "Be On The Lookout" notice was apparently issued in error. Nonetheless, appellant's visitation with Emily remained suspended.

On July 1, 2013, the Anne Arundel County circuit court ordered a limited custody evaluation that was to "include custody/visitation recommendations based on information gathered." Terri Harger, a custody evaluator for the Anne Arundel County Custody Evaluation Unit, performed that evaluation but could not make a recommendation regarding custody or visitation because of "the amount of information the investigator has yet to gather." Upon subsequent request by her to "expand the scope of this evaluation," the court ordered a full custody evaluation, which was completed by Ms. Harger on December 17, 2013.

In the course of completing that evaluation, Ms. Harger interviewed Emily for approximately three hours on September 30, 2013. During the interview, Emily said that her father played the "bug game" with her at the visitation center and touched her above

4

and underneath her clothes, while she and her father sat at tables either in the corner of the visitation room or in the back of that room. Then, when Emily indicated that her father also played the bug game with her in the family's Annapolis home, Ms. Harger asked Emily if there were "any other times that she was alone with her father that he played the bug game or did something else that was similar." That question prompted Emily to disclose, for the first time, that, during the time she lived in Annapolis, her father had had her touch his penis.

She went on to explain that she would go into her father's bedroom[5] early in the morning to watch cartoons and that, upon getting into his bed with him, her father would tell her to go under the covers and "look at it" and "touch [his] thing" or to "touch the back of it." He would then, according to Emily, ask her to "do something like shaking" his penis, which Emily demonstrated, for Ms. Harger, by moving her hands up and down. In light of these new allegations of sexual abuse, Ms. Harger contacted the Maryland Department of Social Services, which thereupon launched a new investigation.

Ms. Harger, in delving into her evaluation at the trial below, testified that she had a "concern" that there was a "likelihood that abuse occurred," as Emily's new disclosures appeared to be "valid." She further stated that she did not believe that Emily had been "coached" or that her mother was attempting to "alienate" Emily from her father. Finally, she described Emily, in her testimony, as "delightful," "alert," and "very engaging," and

---

[5] Appellant and Ms. B. had slept in separate bedrooms since the beginning of their marriage.

considered Emily's "demeanor, her affect and her language to be appropriate" for a child of her age.

Ms. Harger's evaluation recommended that Ms. B. have sole custody of Emily, that Emily receive individual therapy tailored for victims of child sexual abuse, and that "[a]ny contact with [appellant] should be supervised in a professional setting that is closely monitored" and that the monitor should "never leave[] the room" and should provide "notes regarding each contact." Ms. Harger expressed concern about any visitation between Emily and her father, observing that, "if the incidents happened as [Emily] describe[d] . . . reintroducing [her] to her father would be traumatic." Ms. Harger further recommended that, if Emily were to have visitation with appellant, it should be of a therapeutic nature.

Noreen Startt, a social worker for the Anne Arundel County Department of Social Services, also testified at the proceeding below. She investigated the allegations that Emily was sexually abused by her father at the family's Annapolis home. As part of that investigation, Ms. Startt interviewed Emily and her mother and spoke to Ms. Harger and to social workers in Maryland and New Jersey, who had previously investigated Emily's "bug game" disclosures, as well as the detective from the Anne Arundel County police department, who had interviewed appellant.

Ms. Startt stated that she "had questions about or concerns about" Emily's demeanor during their interview, explaining that Emily was "very matter of fact" and showed "no change of expression or affect when she was disclosing particularly disturbing information," which Ms. Startt found "extremely unusual." Ms. Startt was also troubled by the fact that Emily "said nothing positive about her father" and that some of her

6

descriptions of her father's penis were "inconsistent or unexplainable." And she had "questions about when he would have had the opportunity to sexually abuse" Emily, given that appellant's lengthy commute to and from work meant that he was frequently away from home for long stretches of time.

Ms. Startt explained that, at the conclusion of her investigation, she "made an unsubstantiated finding [of abuse] in the case," which meant that there was, in her words, "some evidence to suggest that the abuse occurred and some evidence to suggest that it did not."[6] Her report, however, was not provided to the circuit court and is not part of the record before us.

---

[6] Under the Code of Maryland Regulations 07.02.07.12(B),

A finding of unsubstantiated child abuse is appropriate when there is insufficient evidence to support a finding of indicated or ruled out child abuse. A finding of unsubstantiated may be based, but is not required to be based, on the following:

(1) Insufficient evidence of a physical or mental injury, sexual molestation, or sexual exploitation;

(2) Insufficient evidence that the individual alleged to be responsible for the child abuse was a parent, caretaker, or household or family member;

(3) The lack of a credible account by the suspected victim or a witness;

(4) Insufficient evidence that the child's health or welfare was harmed or was at substantial risk of being harmed; or

(5) Despite reasonable efforts, an inability to complete the investigation due to factors such as:

(continued . . . )

7

At the proceeding below, the circuit court conducted an in-chambers interview of Emily. It thereafter read the notes it had taken, during that interview, into the record in open court. During that interview, Emily stated that her father, during his supervised visits with her, would have her "sit in the corner . . . so that the visitation people didn't see" and then would play the bug game with her, touching her chest, vagina, and buttocks, both above and underneath her clothes. She also said that, when she lived in Annapolis, her father would have her go under the covers of his bed and "touch [his] pee pee." When the court asked Emily if her father's penis had touched any other part of her body, Emily disclosed, for apparently the first time, that "sometimes he would touch this," in reference to her vagina, with his penis, and "that sometimes his pee pee . . . would go in the middle of it and sometimes it wouldn't." As a result of Emily's disclosures during this interview, the court contacted the Department of Social Services, whereupon the Department initiated another investigation.

This third and final investigation was not completed before the proceedings in the circuit court concluded. But, in a motion for reconsideration filed by appellant after the court below rendered its decision, appellant attached a copy of the Department's report from this investigation. In that report, the Department "ruled out" sexual abuse because, in its words, "Emily did not disclose any new allegations of abuse [and] the information

_____

(. . . continued)

        (a) Lack of access to the child or individual alleged to be responsible for the child abuse; or

        (b) Inability to obtain relevant facts regarding the alleged child abuse.

8

that was disclosed ha[d] been previously investigated by other agency workers and findings were made."

On the eleventh and final day of the proceedings—which, at this point, had spanned four months[7]—the circuit court announced its decision, a decision which was, in the court's words, "in very large part . . . based on [its] ability to be able to observe the witnesses who testified and judge their credibility." Applying a "preponderance of the evidence standard"—the standard of proof now at issue—the circuit court found, under FL § 9-101, that there were "reasonable grounds" to believe that appellant had sexually abused Emily. The court specifically noted that Emily's in-chambers disclosures were "appropriate and consistent with what one would expect in this particular factual scenario," and that there was nothing to suggest that Emily "had been coached in any way." It further observed that Emily "used age appropriate words" in her descriptions and "included idiosyncratic details," "details" which it did not "believe she could have known without experiencing what she experienced." The court therefore "found Emily," in its words, "to be a credible little girl."

After noting that appellant had "received no therapy to address" the issue of sexual abuse and did not "seem to have any real understanding as to this issue or its impact on Emily," the court said it could not make a specific finding, under FL § 9-101, that there was no likelihood that appellant would further abuse or neglect Emily. It then went on to

---

[7] The court heard testimony for four days in October of 2013, two days in November of 2013, two days in December of 2013, and two days in January of 2014. The court announced its decision on the record on February 4, 2014.

find that appellant habitually "put[] himself and his interests before his child" and did "not always interact with [Emily] appropriately." The relationship between appellant and Emily was "not good," the court declared. It explained that Emily "understands that her father abused her and that that is having a detrimental impact on anything—on any relationship that they have had in the past and might have in the future."

After acknowledging that restricting or denying visitation with the noncustodial parent, under FL § 9-101, "is a component of the best interest standard and not a separate and distinct standard," the court reviewed more than fifteen factors in determining whether it would be in Emily's best interest for appellant to have visitation with her, including the fitness of both parents, the character and reputation of the parents, the length of time Emily and appellant had been separated, and the relationship between appellant and Emily. None of the factors addressed by the court were resolved in favor of appellant's request for visitation. The court concluded its decision by denying appellant all visitation, supervised or otherwise, stating:

> On the issue of visitation, as I have found that I am not satisfied that it has been proven that there is no likelihood of further abuse, the only access I can give or—or would give in any scenario is supervised access. However, I find that based on the abuse and the evidence that I have heard regarding [appellant], as well as his demeanor and his lack of credibility that I have observed during this proceeding, it is not in Emily's best interest to have supervised visitation with [appellant].
>
> I find that the Court would not be assured that—that Emily would be safe, physiologically, psychologically, or emotionally. Therefore, I decline to order any visitation in this matter.

**Discussion**

**I.**

Appellant contends that the circuit court erred in applying the preponderance-of-the-evidence standard in finding that he had sexually abused Emily and then in denying him any visitation. Before imposing that prohibition, the court must find, he claims, by "clear and convincing evidence" that he had sexually abused his daughter.

In all custody and visitation determinations, the best interest of the child is the "overarching consideration." *Baldwin v. Baynard*, 215 Md. App. 82, 108 (2013). "Thus, while a parent has a fundamental right to raise his or her own child . . . the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell v. Boswell*, 352 Md. 204, 219 (1998). Moreover, while, as a general rule, a parent, who is not granted custody, will be given "a right to liberal visitation with his or her child at reasonable times and under reasonable conditions," this right "is not absolute," and "when the child's health or welfare is at stake visitation may be restricted or even denied." *Id.* at 220–221 (internal quotations marks and citations omitted).

Indeed, FL § 9-101 "requires the court, when faced with a history of child abuse or neglect by a party seeking custody or visitation, to give specific attention to the safety and well-being of the child in determining where the child's best interest lies." *In re Adoption No. 12612*, 353 Md. 209, 238 (1999). And, in cases "where evidence of abuse [or neglect] exists, courts are required by [FL § 9-101] to **deny** custody or unsupervised visitation

**unless** the court makes a specific finding that there is no likelihood of further child abuse or neglect." *In re Mark M.*, 365 Md. 687, 706 (2001) (emphasis in original).

The question we are asked to decide, in the instant case, is the burden of proof that must be satisfied before a parent may be completely denied his right of visitation with his child, for an indefinite period of time. FL § 9-101 governs the approach a trial court must take when child abuse or neglect has been raised in a custody or visitation proceeding. If the text of that statute clearly and unambiguously addresses and resolves the issue before us, we need proceed no further in our analysis. *See, e.g.*, *Opert v. Criminal Injuries Comp. Bd.*, 403 Md. 587, 593 (2008).

FL § 9-101 states:

> (a) *Determination by court.* – In any custody or visitation proceeding, if the court has **reasonable grounds to believe** that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

> (b) *Specific finding required* – Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court **shall deny custody or visitation rights** to that party, **except** that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

(Emphasis added.)

Before we ponder what FL § 9-101 addresses, we shall briefly note what it does not. To begin with, it does not speak to the issue of future "contact" between a parent and his or her child—that is, by telephone, email, letter, and so on—when the parent has been

denied all visitation for an indefinite period of time. And although the circuit court denied appellant all visitation with Emily, it did not deny appellant all contact with his daughter. Appellant therefore still retains his right to communicate with his daughter, even though he was denied the right to visit with her.

Next, FL § 9-101 does not address the steps that a parent, who is denied visitation with his or her child, may take to regain some form of visitation in the future. Nor does it affect the parent's legal right to move to modify a visitation order upon a showing of "a material change of circumstances." *See, e.g., Shurupoff v. Vockroth*, 372 Md. 639, 653, 658 (2003); *McMahon v. Piazze*, 162 Md. App. 588, 593–94 (2005). While we acknowledge that the court below did not mention what appellant could do to regain visitation, or that he could request modification of the visitation order based on a showing of a material change in circumstances, it did not, on the other hand, suggest that, if appellant were to seek a form of supervised visitation sometime in the future, it would flatly deny such a motion. Moreover, given the well-settled legal precept that visitation orders are subject to modification upon a showing of a material change in circumstances, we have no reason to doubt that appellant was informed of this possibility by counsel, regardless of whether the court expressly mentioned it in rendering its decision or not.

With that in mind, we turn now to what the plain language of the statute does address. FL § 9-101 requires that a circuit court, facing allegations of child abuse or neglect in a custody or visitation proceeding, first determine whether it has "reasonable grounds to believe" that the parent seeking custody or visitation has abused or neglected a child. FL § 9-101(a). Then, upon a finding that reasonable grounds exist to believe that abuse or

13

neglect has occurred, the court must make an additional specific finding as to whether further child abuse or neglect is likely to occur if custody or visitation rights are granted to the parent responsible for the abuse or neglect. FL § 9-101(a). If the court finds that it is unable to make that specific finding, it is required to deny custody or visitation rights to the abusive parent, though the court may, but is not required to, approve a supervised visitation arrangement that assures the safety and well-being of the child. FL § 9-101(b).

The question before us turns on the meaning of the phrase "reasonable grounds to believe," as it is used in FL § 9-101, and the burden of proof that locution mandates. The answer may lie in *Volodarsky v. Tarachanskaya*, 397 Md. 291 (2007). That case presents a set of facts and issues similar to those now before us. There, as here, the court below was presented with a dispute between a mother and father over which of them should have custody of, or visitation with, their daughter, a dispute that revolved around conflicting testimony as to whether the father had sexually abused the child. *Id.* at 292–93. "[P]ersuaded" that the child at issue had been "exposed to sexual behavior," although "not . . . convinced by a preponderance of the evidence that [she had] been the victim of sexual abuse, or that her father [had] perpetrated sexual abuse," the *Volodarsky* circuit court, after awarding sole custody of the daughter to the mother, nonetheless precluded visitation with the father "other than in a therapeutic setting." *Id.* at 302–03. It did not, however, totally deny the father all right of visitation, as did the court below.

The pertinent issue before the Court of Appeals in *Volodarsky* was whether the circuit court's "finding or determination" that abuse or neglect had likely occurred must "**at a minimum** . . . be made by at least a preponderance of the evidence." *Id.* at 304

14

(emphasis in original). The Court of Appeals concluded that, "in the context of [FL] § 9-101," the reasonable-grounds-to-believe language of the statute and the preponderance-of-the-evidence standard were not "different standards of proof." *Id.* In fact, the preponderance standard, the Court of Appeals opined, was the correct standard for the circuit court to apply in determining whether there were reasonable grounds to believe that abuse or neglect had occurred. *Id.* at 308.

We do take note, however, as appellant requests, that the *Volodarsky* Court stated, in a footnote, that it was "not asked . . . to address, and [it did] not address" whether "a standard higher than preponderance might be required where the effect of the finding [that abuse or neglect occurred] might be to deny a parent all right of visitation with his or her child and must be, at a minimum, to place significant limits on such visitation." *Id.* at 306 n.5. Appellant relies on this footnote to argue that the Court of Appeals intended that a burden of proof greater than a preponderance of the evidence must be met before all visitation is denied a parent. We are not persuaded, however, that the footnote at issue contained such a message. In our view, the footnote simply left it an open question as to whether a greater burden of proof might be required when all visitation is denied. We shall now attempt to answer that question.

We begin by returning to the language of FL § 9-101. The plain language of that statute clearly states that the same evidentiary standard of proof—that is, the "reasonable grounds to believe" standard—is the appropriate standard whether the court is granting visitation, supervised visitation, or none at all. Subsection (a) of that section states that if the court has reasonable grounds to believe that a party to the proceeding has abused or

15

neglected a child, it "shall determine" whether abuse or neglect is likely to occur if that party is granted custody of, or visitation with, the child. Subsection (b) then instructs that custody or visitations rights "shall" be denied to that party if the court is unable to specifically find that there is no likelihood of further abuse or neglect. There is no indication in the statutory language that a burden of proof greater than "reasonable grounds to believe" is required before visitation can be denied. Rather, the statute unambiguously states that "reasonable grounds to believe" that abuse or neglect has occurred—which the Court of Appeals has said is indistinguishable from proof, by a preponderance of the evidence, that abuse or neglect has happened—is grounds for denying any and all visitation by the parental abuser.

Lest any doubt remain as to the validity of this interpretation of FL § 9-101, we note that the Governor's Task Force on Child Abuse and Neglect, which drafted and proposed FL § 9-101 in 1984, explained that the statute "expressly requires a court to restrict **or deny** custody or visitation rights to a party if abuse or neglect has previously occurred and there is any likelihood that abuse or neglect may continue to occur."[8] January 1984 Preliminary Report of the Governor's Task Force on Child Abuse and Neglect, at 5 (emphasis added). Moreover, there is nothing in the legislative history of the statute to suggest that either the Task Force, when it proposed the new law, or the Legislature, when it enacted it, intended

---

[8]  FL § 9-101 was enacted, in 1984, in exactly the same form as proposed by the Governor's Task Force. The only difference between FL § 9-101 as it was originally enacted and the current language of the statute was the addition, in 1985, of the phrase "and the physiological, psychological, and emotional well-being" near the end of subsection (b). Md. Laws Ch. 659 (1985).

16

to impose one standard of proof when supervised visitation between the abusive parent and his or her child is ordered, but another, higher, standard of proof when completely denying visitation between them. Rather, the statute was written so that "reasonable grounds to believe" that abuse or neglect has occurred would require the court to deny visitation rights. And "reasonable grounds to believe" means, as the Court of Appeals has pointed out, a "preponderance of the evidence." For us to hold otherwise, that is, that clear and convincing evidence of abuse or neglect is required to deny a parent all right of visitation, would be in clear contradiction of the "reasonable grounds to believe" language of FL § 9-101 and would impose a burden of proof not contemplated by the Legislature. Such a change lies within the purview of the Legislature, not the judiciary.

Ultimately, our decision in this case must be consistent with what we believe to be the clear language and intent of FL § 9-101. As we have explained, a circuit court that has "reasonable grounds to believe" that a parent has abused or neglected a child and that cannot specifically find that there is no likelihood of further abuse or neglect is required, under the statute, to "deny custody or visitation rights" to that parent. And, as the Court of Appeals has explained, "[i]t is by using the preponderance standard that the [circuit court] determines whether reasonable grounds exist," under FL § 9-101, to believe that child abuse or neglect has occurred. *Volodarsky*, 397 Md. at 308. For this reason, and all of the reasons noted above, we decline appellant's invitation to adopt a greater burden of proof in instances where the circuit court denies all visitation between parent and child, and hold that the court below did not err in applying the preponderance-of-the-evidence standard in

17

determining that it had "reasonable grounds to believe" that appellant had sexually abused his daughter.

## II.

Appellant contends that the circuit court abused its discretion in not granting him at least supervised visitation with Emily. In reviewing that decision, we apply an abuse of discretion standard. *North v. North*, 102 Md. App. 1, 12–13 (1994). That standard requires reversal only when we find that the circuit court has acted "without reference to any guiding rules or principles," or that "no reasonable person would take the view adopted by the [circuit] court," or that the decision of that court is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Id.* at 13–14 (internal citations and quotation marks omitted).

With respect to the "guiding rules or principles" applicable in the proceeding below, the circuit court dutifully considered what would be in Emily's best interests and incorporated, into that determination, its analysis under FL § 9-101. Specifically, it found, by a preponderance of the evidence, that appellant had sexually abused Emily, and then considered whether it could "specifically find[]" that there was no likelihood that appellant would further abuse or neglect Emily if he was awarded visitation rights, and said that it could not make that specific finding. Upon reviewing the numerous factors as to what would be in Emily's best interests, it concluded, "based on the abuse and the evidence that [it had] heard regarding the [appellant], as well as his demeanor and his lack of credibility," that it was not in Emily's best interest to have supervised visitation with appellant, and that Emily's physical, psychological, and emotional well-being could not be assured if such

visitation was allowed. Consequently, the court "decline[d] to order any visitation in this matter."

Furthermore, the court's decision not to order any visitation between Emily and appellant was neither one that no reasonable person would adopt nor "beyond the fringe of what [this] court deems minimally acceptable." As the Court of Appeals has noted, "where there is evidence that visitation may be harmful to the child," visitation may be "restricted or even denied." *Boswell*, 352 Md. at 221. We note that the court below heard testimony from several witnesses, and also heard from Emily herself when the court interviewed her in chambers, that appellant had touched Emily inappropriately during their supervised visitation sessions. In light of the evidence that abuse had previously occurred during visitation, and in a supervised setting, it was not unreasonable for the court to deny appellant supervised visitation with Emily.

Finally, in reviewing a visitation order, we must give "due regard . . . to the opportunity of the lower court to judge the credibility of the witnesses," because that court, which "sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child," is in "a far better position than is an appellate court . . . to weigh the evidence and determine what disposition will best promote the welfare of the [child]." *In re Yve S.*, 373 Md. 551, 584, 586 (2003) (internal quotation marks and citation omitted). The circuit court's decision to deny appellant any visitation with Emily was, in its words, "in very large part . . . based on [its] ability to be able to observe the witnesses who testified and judge their credibility." The court also found Emily to be a credible witness, a finding

19

that it did not make as to appellant, whose credibility it found lacking.  It is not our role, as an appellate court, to second-guess those findings.

In light of the lower court's determination of whether visitation with appellant would be in Emily's best interests, the evidence presented regarding appellant's abuse of Emily in supervised visitation settings, and the credibility determinations made by that court, we conclude that it did not abuse its discretion in declining to award appellant supervised visitation with his daughter.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**