*In re O.P.*, No. 2877, September Term, 2018.  Opinion by Fader, C.J.

**APPEALABILITY – COLLATERAL ORDER DOCTRINE**

An order denying a petition for continued shelter care filed by a local department of social services is an interlocutory order that is appealable under the collateral order doctrine because it constitutes the final resolution of an important issue that is completely separate from the merits of a CINA petition and would be effectively unreviewable on appeal.

**CONTINUATION OF SHELTER CARE IN CINA PROCEEDINGS– STANDARD OF PROOF**

For a juvenile court to authorize the continuation of shelter care beyond emergency shelter care, the court must find by a preponderance of the evidence that (1) returning the child home is contrary to the child's safety and welfare and (2)(a) removal is necessary due to an alleged emergency and to provide for the child's safety, or (b) reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal.  Md. Code Ann. Cts. & Jud. Proc. § 3-815(d).

Circuit Court for Anne Arundel County
Case No. C-02-JV-18-000692

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2877

September Term, 2018

_____


IN RE: O.P.


_____

Fader, C.J.,
Meredith,
Friedman,


JJ.
_____

Opinion by Fader, C.J.
_____

Filed:  March 29, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

We must first determine the correct standard of proof for a juvenile court to apply to a petition for continued shelter care[1] of a minor pending consideration of a petition to find that the minor is a child in need of assistance. We conclude that for a juvenile court to authorize the continuation of shelter care, the court must find by a preponderance of the evidence that (1) returning the child home is contrary to the child's safety and welfare, and (2)(a) removal is necessary due to an alleged emergency and to provide for the child's safety, or (b) reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal. Here, the Circuit Court for Anne Arundel County, sitting as a juvenile court, did not err in applying the preponderance standard to the petition for continued shelter care filed by the appellant, Anne Arundel County Department of Social Services (the "Department").

We are asked, second, to determine whether the juvenile court clearly erred in making certain findings of fact or abused its discretion in ultimately determining that the Department did not carry its burden of proof. On this record, we conclude that the juvenile court did not clearly err as to the findings of fact on which it based its ultimate conclusion or abuse its discretion and, therefore, we affirm.

Decisions concerning continuation of shelter care, especially where the minor is an infant, are some of the most difficult that a court can face. Information is often unavoidably scarce, facts are often developing and disconcertingly unclear, the law requires immediate

---

[1] "'Shelter care' means a temporary placement of a child outside of the home at any time before disposition." Md. Code Ann., Cts. & Jud. Proc. § 3-801(aa) (Repl. 2013; Supp. 2018).

action, and the interests and stakes involved—the health and safety of defenseless children and parents' fundamental liberty interest in raising their children—are among the most important a court can be called upon to assess. The General Assembly has implemented a statutory scheme to navigate these issues and balance these interests. That scheme calls upon a juvenile court to find by a preponderance the necessary factors or, if it cannot do so, to deny continued shelter care. After reviewing the principles and interests involved, we find no compelling constitutional principle that would permit, much less compel, us to depart from that scheme.

## BACKGROUND

### *Emergency Shelter Care*

O.P. was born seven weeks prematurely, on October 7, 2018, to parents N.R. ("Mother") and S.P. ("Father"). He spent the first seven weeks of his life in the neonatal intensive care unit ("NICU") of Johns Hopkins Hospital until his discharge on November 23. Three weeks later, on December 14, the Department received a report that O.P. had been admitted to Johns Hopkins Hospital due to unexplained brain injuries. On December 21, the hospital discharged O.P to the Department's custody to be placed in emergency shelter care.

### *The Department's First Petition for Continued Shelter Care*

On December 26, the next day the courts were open, the Department filed a Child in Need of Assistance ("CINA") petition and a request for continued shelter care with the juvenile court. The petition included the following allegations:

2

- According to O.P.'s parents, on December 12, there had been an incident in which O.P. was choking and "appeared to have stopped breathing." Father "performed CPR" and Mother called 911. The parents reported that the emergency personnel who responded to the incident determined that O.P. "appeared fine at that time."

- When O.P. visited his pediatrician two days later, the doctor "was concerned about the infant's increased head circumference and had [O.P.] sent immediately to Johns Hopkins Hospital emergency room."

- O.P. was admitted to the hospital after it was determined that he "had both subdural and subarachnoid hemorrhaging."

- Medical providers "indicated that the injuries and finding [sic] are consistent with abusive head trauma and strongly recommended that [O.P.] not be returned to the parents' care at that time, given that there was no plausible explanation as to what caused the brain bleeds and both parents' troubling mental health histories."[2]

- The Department held a "Team Decision Making meeting" on December 26 in which O.P.'s parents participated. They "were unable to develop a plan that would assure [O.P.'s] safety other than to place him in out of home care."

That same day, December 26, a juvenile magistrate held a hearing and granted the Department's request for an order continuing shelter care pending adjudication.

### The First De Novo Shelter Care Hearing

Mother exercised her statutory right to request an immediate review of the magistrate's order and the juvenile court held a de novo shelter care hearing the next day.[3]

---

[2] The "troubling mental health histories" included that (1) Mother "is diagnosed with Bi-polar disorder and depression" and was treated with Lithium "from June 2018 until sometime recently when she stopped the medication because of side effects," and (2) Father, in the past, had "significant suicidal ideation and depression" and is not currently in treatment. Father had been previously prescribed anti-depressants but stopped taking them because "they sometimes made him aggressive."

[3] Pursuant to Rule 11-111(a), magistrates are "authorized to order detention or shelter care in accordance with Rule 11-112 (Detention or Shelter Care) subject to an immediate review by a judge if requested by any party." As to all other matters, magistrates are "authorized to hear any cases and matters assigned to him by the court," but a

3

The Department presented (1) the testimony of child protective services worker Joshua Kay and (2) the hospital's discharge summary for O.P. In light of the nature of the challenge to the juvenile court's findings and ultimate determination, we present Mr. Kay's testimony in some detail.[4]

Mr. Kay testified regarding what the parents had told him about the incident in which O.P. had stopped breathing:

- The incident occurred on December 12;
- Father, who was home with O.P. at the time, heard O.P. "beg[i]n to make choking noises" and then it "appeared that he had stopped breathing."
- When Father checked and "could not hear or feel any breathing," he administered CPR.
- O.P. then began to breathe and at some point, Father called Mother who called 911.
- O.P's parents told Mr. Kay that emergency medical services ("EMS") personnel checked O.P's vitals and determined that O.P. was "okay."
- The paramedics then gave the parents three options: allow EMS to take O.P. to the hospital, take O.P. to the hospital themselves, or take O.P. to a previously scheduled doctor's appointment the following day.
- "EMS then recommended that they just go to the appointment that was already scheduled on the 13th."

Mr. Kay also spoke to O.P's pediatrician, Dr. David Dominguez, and others within Dr. Dominguez's office. Based on those conversations, Mr. Kay testified that O.P. was "schedule[d] to have weekly appointments" because "he had been having trouble gaining

_____

magistrate's "findings, conclusions and recommendations" on such other matters "do not constitute orders or final action of the court." Md. Rule 11-111(b).

[4] As discussed below, the Rules of Evidence do not apply to shelter care hearings. Md. Rule 11-112(d). As a result, Mr. Kay was permitted to, and did, testify without any restrictions against the introduction of hearsay.

weight." The pediatrician's office told Mr. Kay that O.P. had been scheduled for an appointment on December 12, which was missed, and that he had never been scheduled for an appointment on December 13. The parents brought O.P. for an appointment on December 14, at which Dr. Dominguez became concerned about O.P.'s "expanded head circumference" and "the observable veins in [his] head." As a result, Dr. Dominguez told Mr. Kay, he "sent them to the ER." The parents never informed Dr. Dominguez about the incident in which O.P. was choking and stopped breathing. The doctor learned about that incident only later from Dr. Mitch Goldstein of Johns Hopkins Hospital.

Mr. Kay also testified about his communications with Dr. Goldstein, the physician in charge of the child protection team that evaluated O.P. at the hospital. Dr. Goldstein told Mr. Kay that he had conducted tests and reviewed some of O.P's medical records. Dr. Goldstein also reported that there was "intracranial bleeding," specifically "subdural hematoma and subarachnoid hematoma," which was "consistent with abusive head trauma" incurred "on two different occasions." The doctor believed the injuries occurred on two different occasions because there was "newer blood and older blood" in "two different locations," which could not be the result of a birth defect or medical issue.

Notably for our purposes, Mr. Kay also reported that Dr. Goldstein said that he could not determine the timing or age of the two bleeds, other than "that one was older and one was newer." Although the Department had attempted to get information that would narrow the timeframe, Dr. Goldstein told Mr. Kay that "medical technology does not allow them to put any dates, whether it was, you know, two weeks old, two months old or [sic] either

5

of the bleeds." Indeed, on cross-examination, when asked if "[t]he bleeding could have occurred while [O.P.] was in the NICU," Mr. Kay responded that "[w]hat was explained to [him] is, yes, that there is just no time frame for when the bleeding occurred."

Mr. Kay also acknowledged during cross-examination that Mother had shown him a picture from when O.P. was still in the NICU in which he had the same protruding veins that had concerned Dr. Dominguez on December 14.

Finally, Mr. Kay testified that he had initially attempted to establish a safety plan under which O.P. "could come home and be under 24-hours a day/seven days a week supervision by the maternal grandfather, [who lived in the same home with O.P. and his parents], that he would ensure that the parents were never left alone with" O.P. However, once the Department received information from Dr. Goldstein that O.P.'s injuries were consistent with abusive head trauma, he became concerned that the grandfather might "be a possible cause of the head trauma" and so the Department was no longer "comfortable doing a safety plan with the parents."

O.P.'s hospital discharge summary, which the court admitted into evidence, indicates that on December 14, O.P.'s head circumference was 40 centimeters, his "[s]calp veins were prominent," and his "[e]yes showed mild sundowning." Notes near the end of the summary state that the hospital's child protective team "noted concern[] for possibility of inflicted neurotrauma." An MRI taken on December 19 identified multiple hemorrhages

6

and hematomas in O.P.'s head.[5]  The summary also noted that the protruding veins were "likely secondary to trauma"; and that this "[c]onstellation of findings can be seen in the setting of nonaccidental injury, clinical correlation recommended."  Mr. Kay testified that in addition to this discharge summary, he had Dr. Goldstein's "written findings" in his possession, but he did not produce them at the hearing.

At the conclusion of the Department's case, the juvenile court granted Mother's request to deny the petition for continued shelter care.  The court determined that the Department had failed to meet its burden, even construing the facts presented in the light most favorable to the Department.  As a result, the court ordered the immediate return of O.P. to his parents.[6]

### The First Appeal

The Department immediately noted an appeal and sought an injunction from this Court.  We granted a temporary stay and remanded the matter "to permit the juvenile court to explain the basis for its decisions and to allow for preparation and transmission of all of

---

[5] The MRI revealed "[m]ultifocal and extensive extra-axial hemorrhages; [b]ilateral frontoparietal subdural collections, bilateral posterior parietal subdural hematomas, posterior fossa small subdural hemorrhage, bilateral frontal subpial and subarachnoid hemorrhages."

[6] The court also denied the Department's request for an order to control the conduct of the parties, as authorized by Rule 11-110(e) ("The court, upon its own motion or on application of any person, institution, or agency having supervision or custody of, or other interest in a respondent child, may direct, restrain or otherwise control the conduct of any person properly before the court in accordance with the provisions of Section 3-827 of the Courts Article.").  The court denied the request on the ground that it was "beyond the purpose" of the hearing.

7

the evidence considered by the juvenile court" so that we could consider the request further. In the meantime, we ordered that, pending the issuance of a new order by the juvenile court, "the parties shall return to the status quo that preceded the issuance of the juvenile court's December 27, 2018 decisions (i.e., the infant O.P. shall be immediately returned to the Department's emergency shelter care)."

### *Further Juvenile Court Proceedings*

On December 31, 2018, the juvenile court issued a memorandum opinion and order explaining its December 27 decision. On January 3, 2019, the Department filed in the juvenile court an amended CINA petition with an amended request for shelter care, stating that it had acquired additional evidence. The amended petition included the following new allegations:

- Although the parents had contended that the incident in which O.P. was found choking and not breathing occurred on December 12, the Department had learned that it occurred on December 10. The responding paramedics indicated that Father had told them that O.P. "had been gagging" and that Father "picked up [O.P.] and began stimulating and delivering back slaps." The paramedics did not mention any "administering [of] CPR or [O.P] not breathing."

- Those paramedics also stated that O.P.'s parents had refused their recommendation that O.P. "be transported to the Emergency Room for evaluation at that time."

- When seen on December 14, O.P. had "sunsetting of his eyes" as well as the "increased head circumference" that were "concerning for hydrocephalus,[7] which was not present at prior visits."

---

[7] Hydrocephalus is "a condition in which fluid accumulates in the brain, typically in young children, enlarging the head and sometimes causing brain damage." *New Oxford American Dictionary*, "hydrocephalus," at 853 (3d ed. 2010).

8

- O.P.'s birth records, also newly-received, "indicate that [O.P.'s] head was examined and determined to be normocephalic[8] and atraumatic[9] on at least three occasions during the child's birth stay [at the NICU], including at discharge on November 23," and that there was no "concern for [O.P.'s] head size or condition, or that [O.P.] suffered any brain related incidents while in the hospital."
- At O.P.'s appointments with his pediatrician on November 27 and December 5, his "head was described as normocephalic and atraumatic."

On January 2, 2019, Mother filed a motion in this Court to lift its stay and immediately return O.P. to his parents. The Department opposed the motion in a filing that noted its new evidence and newly-filed amended petition. We denied Mother's motion but ordered that the stay would expire as soon as the juvenile court entered an order resolving the Department's amended shelter care request. On January 7, a magistrate held a hearing on the amended request and granted continued shelter care. The parents again requested an immediate review by the juvenile court, which held a de novo hearing on January 8 and 9 limited in scope "to all new allegations not contained in the original Petition."

### The Second De Novo Shelter Care Hearing

At the second de novo hearing, the Department again presented Mr. Kay as its only witness and also introduced additional documentary evidence, including EMS records from the paramedics who responded to the incident that occurred on December 10 and medical records from O.P.'s time in the NICU and subsequent visits to the pediatrician.

---

[8] Normocephalic means "having a normal head." *Stedman's Medical Dictionary*, "normocephalic," at 1331 (28th ed. 2006).

[9] Atraumatic is defined as "not resulting from trauma." *Taber's Cyclopedic Medical Dictionary*, "atraumatic," at 209 (21st ed. 2009).

9

Mr. Kay testified as to the new information he had learned in the 12 days since the first hearing, which consisted almost entirely of the contents of the EMS and medical records. He testified that the EMS records showed that the incident in which O.P. had choked and stopped breathing had actually occurred on December 10, which meant that it had taken the parents four days, not two, to take O.P. to a doctor following that incident. Those records also showed that Father "had refused medical advice" that O.P. be "taken immediately to the E.R," whereas Father "had previously stated that he had followed the recommendations of the paramedic to go to the pediatrician the following day."

Mr. Kay also testified that medical records from Dr. Dominguez's office showed that Dr. Dominguez had expressed concern that O.P. had missed medical appointments with specialists, including a gastro-reflux doctor and an ear, nose, and throat doctor, and that Mother did not follow through "for postpartum discretion [sic] screening." As identified in the amended petition, the pediatric records also note that when O.P. was taken in on December 14, he had "an increasing head circumference," "bulging . . . scalp veins," and "sunsetting of his eyes," which were "concerning for hydrocephalus." Mr. Kay also testified that O.P.'s records from the NICU, which he had obtained since the first hearing, indicated that O.P.'s "head circumference [was] normal."

Mr. Kay testified that he had not spoken with Dr. Goldstein or any other members of the Hopkins evaluation team since the first hearing. He also acknowledged that the written findings from Dr. Goldstein that he referred to in his testimony at the first hearing, but did not produce, were in the form of an e-mail "sent from a coordinator that was in

10

reference to statements that were from Dr. Goldstein, but it was not part of the records that we received." The e-mail was not presented to the court.

The EMS records the Department introduced into evidence identify the choking incident as having occurred on December 10. The records also reveal that the paramedics informed O.P.'s parents that "EMS recommends transport to local pediatric ER for evaluation but indicate they no longer believe it to be necessary. . . . Parents were also advised if they did not transport [O.P.] to local ER of their choice to still contact [O.P.'s] pediatrician in the morning." The EMS personnel obtained Father's signature for "refusal of services" against medical advice.

However, the EMS records also reflect that the provider's "Primary Impression" of O.P. as a result of the incident was "No Apparent Illness/Injury [Unknown]." The space for a secondary impression is left blank. The narrative explanation of the incident also notes that the EMS providers found O.P. "in no apparent distress with good skin color," and that his "baseline vitals were assessed and stable."

The Hopkins medical records contain findings from several different evaluations performed during O.P.'s seven weeks in the NICU and at three pediatric visits. The NICU records indicate that O.P.'s head circumference at birth was 31cm. By November 19, four days before discharge, his head had grown to 37.6 cm. Pediatric records from a visit on December 5 state that his head circumference was 37.5 cm. Each of these records from birth through December 5 describes O.P.'s head as both "normocephalic" and

11

"atraumatic." None of the medical records before December 14 appear to identify any concern with the size of O.P.'s head.

After the Department closed its case, the court considered, and then denied, a motion by the parents to dismiss the petition. The parents then presented testimony from both Mother and Father. Mother testified that O.P. suffered from acid reflux, causing him to have difficulty "keeping his food down," and had been prescribed Zantac. He also had laryngomalacia, which caused episodes of sleep apnea and had caused him to stop breathing twice while in the NICU. "One time he corrected it himself, and then another time the nurse . . . had to get involved and help him." Mother testified she was not given any instructions from the hospital regarding the laryngomalacia or what to do if O.P. stopped breathing again.

Mother acknowledged that Dr. Dominguez had advised her to make an appointment with a specialist for O.P.'s conditions. She had missed the appointment for the laryngomalacia because it had been scheduled on a date when O.P. was still in the hospital for the brain injury. She also attempted to schedule an appointment for the acid reflux, but was told that, absent an emergency, an appointment could not be scheduled for approximately one month.

In explaining the discrepancy as to the date of the incident in which O.P. choked and briefly stopped breathing while at home, Mother testified that she "had [her] dates mixed up" when she initially spoke with Mr. Kay. She also testified that the paramedics did not inform her of a health risk if she did not take O.P. to the hospital right away and

12

she explained that she did not do so because she assumed the incident was just another incidence of what had occurred in the NICU: "[S]o I wasn't too worried about it because it's happened before and with that condition it's more than likely to happen again."

With respect to missing pediatric appointments, Mother testified that she had missed the appointment on December 12 due to a confusion about the time. She made an appointment for the following day, but that morning was informed that Dr. Dominguez would not be there. She then made the appointment for December 14, which led to O.P.'s hospitalization. She acknowledged that she had not told Dr. Dominguez about the December 10 incident during that appointment, but said that she did not have the opportunity because Dr. Dominguez "seemed really urgent about the head circumference and he just wanted us to go to the ER."

Mother also introduced a medical chart from the hospital showing O.P.'s head growth over time. The chart depicts the head circumference-for-age percentiles for premature boys of 23.5 to 50 gestational weeks (i.e., based on age since conception rather than age since birth) with curves identifying the 3rd, 10th, 50th, 90th, and 97th percentiles, and plots O.P.'s head circumference on the same chart. According to the chart, (1) O.P.'s head circumference at birth (33 gestational weeks) was right at the 50th percentile; (2) his head circumference increased over the following few weeks, rising above the 90th percentile by 39 weeks and almost to the 97th percentile at approximately 40 weeks, which was around the time of his discharge; (3) his head circumference then stopped expanding for a brief period, falling back under the 90th percentile by approximately 42 weeks; and

13

(4) then measured well above the 97th percentile line beginning at approximately 44 weeks, which corresponds to his visit to the pediatrician on December 14 and subsequent hospitalization.

Father's testimony was more limited. He testified that he learned infant CPR in the Navy and performed it on O.P. on December 10 when he "heard no breathing." When the paramedics arrived, O.P. "was breathing, crying, and he seemed back from where he was." The paramedics "indicated that they didn't seem that there was a continuing emergency" and that a baby crying following CPR "is the best sound you can hear."

On January 10, 2019, the court issued a second memorandum opinion and order in which it made findings of fact including the following:

- Following the December 10 choking/not breathing incident, O.P. was checked by the paramedics "and determined to be normal." "The EMT narrative clearly indicates" that transport to the emergency room "was advised for 'evaluation' and not for emergency treatment, as the EMT's found the child's condition on the scene to be normal."

- The Department "did not produce the pediatrician at either review hearing."

- Dr. Goldstein, as relayed through Mr. Kay, "characterized his findings . . . as being 'consistent' with abusive head trauma, 'in the absence of plausible explanation.'" However, Mr. Kay "acknowledged that he made no inquiry of Dr. Goldstein about what other scenarios would be 'consistent' with [O.P.'s] condition" nor did the Department undertake efforts "to investigate the care of [O.P.] while in the hospital NICU for 48 days; the majority of the young infant's life."

- "[O]f greatest significance, [Mr.] Kay testified that he was advised by Dr. Goldstein that current medical science cannot date the age of either of the two hemorrhages." The Department "produced no additional evidence at the second hearing to establish a timeline for the injuries, nor any evidence as to the cause of such injuries."

- Although the Department alleged "neglect by the parents in not allowing the EMT's to transport [O.P.] to an emergency room, and waiting four days to

14

see the pediatrician, there was no evidence presented that those decisions by the parents in any way harmed the child."

- "While in the NICU, [O.P.'s] head was growing abnormally large."

- "The Court finds both parents to be completely credible, especially as to their descriptions of the events at issue, and most especially their concern and caring for an infant with multiple medical challenges. They are young, a bit overwhelmed by the events, especially since the filing of the CINA petition, and clearly have had challenges navigating the healthcare system."

- "It is telling that the [Department] . . . never questioned the parents as to the care of the minor child during the 22 days he was in the home after the initial stay in the NICU, except for the administration of medications. Neither were questioned whether any events occurred in the home to explain the internal head injuries."

- Mr. Kay "only summarize[d] hearsay conversations with the doctors, leaving a number of details unanswered." "[T]he Court was not given the opportunity to judge first-hand the accuracy, consistency or credibility of either the EMT's or the pediatrician. Such witnesses were available to the [Department], which did not avail itself of compulsory process, nor gave any real explanation of why such witnesses were not produced, other than 'we tried. . . '. This is a critical consideration for the Court having found the parent's [sic] descriptions of events and explanations of minor discrepancies to be credible."

- "The Court finds that the timing of the two hemorrhages cannot be determined. All of the intra-cranial bleeding could have occurred while [O.P.] was in the NICU . . . for seven weeks, or during the 22 days after the child was home, including during the justifiably vigorous administration of CPR at the time of the choking/[not] breathing event. The stubborn refusal of [the Department] to thoroughly investigate the hospital stay is inexplicable." "As such, no reasonable inferences can be drawn placing responsibility for such injuries upon the parents."

- The Department "did not make reasonable efforts in preventing or eliminating the need for removal of the child from the home." The Department abandoned the safety plan prepared "solely on the basis of Dr. Goldstein] of Hopkins telling [Mr.] Kay that in the absence of any plausible explanation, the head injuries were due to non-accidental trauma. The Court finds that to be insufficient reason to decline to pursue the safety plan . . . ."

Based on these findings, the Court concluded that the Department "failed to meet its burden, even by a preponderance of the evidence, to prove that the injuries suffered by

15

[O.P.] were 1) non-accidental or; 2) that they were caused by the abuse or neglect of the parents while in their custody or control." The Department also "failed to meet its burden to prove that the parents neglected their child by failure to allow the EMT's to transport the child for evaluation after the choking/[not] breathing incident, or by waiting four days to see the pediatrician." The court therefore denied the Department's request for continued shelter care and, because this Court's injunction automatically expired upon the issuance of the juvenile court's opinion and order, ordered the Department to return O.P. to his parents that day.

The Department and O.P. noted immediate appeals and again sought an injunction from this Court. We denied the request for an injunction pending appeal but expedited briefing and argument and directed the parties to address in their briefing the appropriate legal standard for continuing shelter care.

## DISCUSSION

In Part I of this opinion we lay out the relevant statutory scheme as it relates to CINA cases generally and the shelter care proceedings that are the focus of this appeal.

In Part II, we turn to Mother's claim that we lack jurisdiction over this interlocutory appeal. We conclude that we have jurisdiction under the collateral order doctrine because the juvenile court's order constitutes the final resolution of an important issue—whether O.P. should be placed in shelter care on an emergency basis—that is completely separate from the merits of the CINA petition and that would be effectively unreviewable on appeal.

In Part III, we address the core dispute among the parties as to the proper standard of proof to apply in a shelter care hearing. The parties' arguments reveal a wide chasm in their respective positions on this issue. The Department contends that the correct legal standard of proof is "reasonable under the circumstances." O.P. similarly argues for a "reasonable grounds to believe" standard. Father, on the other hand, argues for a preponderance of the evidence standard, which is what the juvenile court employed, while Mother argues for clear and convincing evidence. Based on the plain language of the statute, as well as on its context and the important interests involved, we conclude that preponderance of the evidence is the correct standard.

In Part IV, we return to the facts of this case and address the claims of the parties that they each should prevail regardless of the applicable standard of proof, including the claims of the Department and O.P. that the juvenile court made clearly erroneous findings of fact and erred in reaching its ultimate conclusion.

The standard of review applicable to CINA proceedings is well-established: (1) we review factual findings of the juvenile court for clear error, (2) we determine, "without deference," whether the juvenile court erred as a matter of law, and if so, whether the error requires further proceedings or, instead, is harmless, and (3) we evaluate the juvenile court's final decision for abuse of discretion. *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 214 (2018).

17

## I.     THE STATUTORY SCHEME

### A.     CINA Proceedings Generally

A "child in need of assistance," or CINA, is "a child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Cts. & Jud. Proc. § 3-801(f), (g). The General Assembly has codified the provisions of the law governing CINA proceedings in Subtitle 8 of Title 3 of the Courts and Judicial Proceedings Article, and has defined the "purposes of th[e] subtitle" as:

> (1) To provide for the care, protection, safety, and mental and physical development of any child coming within the provisions of this subtitle;
>
> (2) To provide for a program of services and treatment consistent with the child's best interests and the promotion of the public interest;
>
> (3) To conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare;
>
> (4) To hold parents of children found to be in need of assistance responsible for remedying the circumstances that required the court's intervention;
>
> (5) Except as otherwise provided by law, to hold the local department responsible for providing services to assist the parents with remedying the circumstances that required the court's intervention;
>
> (6) If necessary to remove a child from the child's home, to secure for the child custody, care, and discipline as nearly as possible equivalent to that which the child's parents should have given;
>
> (7) To achieve a timely, permanent placement for the child consistent with the child's best interests; and
>
> (8) To provide judicial procedures for carrying out the provisions of this subtitle.

*Id.* § 3-802(a). The statute also commands that it "shall be construed liberally to effectuate these purposes." *Id*. § 3-802(b).

18

Subtitle 8 establishes a comprehensive statutory scheme to govern proceedings when a child is alleged to be a CINA. The statute gives "exclusive original jurisdiction" to a juvenile court over proceedings arising from CINA petitions, *id.* § 3-803(a)(2), and establishes, among other things, the scope of the court's jurisdiction over children, venue for proceedings, assignment of judges, the appointment and authority of juvenile magistrates, the review of decisions or recommendations of magistrates to the juvenile court, the confidentiality of proceedings, the scope of a local department's obligation to make reasonable efforts to reunify children and parents, and the State's obligation to provide counsel to represent children, as well as indigent parents and guardians of an alleged CINA, in CINA proceedings, *id.* §§ 3-804, 3-805, 3-806, 3-807, 3-810, 3-812, & 3-813.

A local department of social services is required to file a CINA petition if, after receiving "a complaint from a person or agency," "it concludes that the court has jurisdiction over the matter and that the filing of a petition is in the best interests of the child." *Id.* § 3-809(a). "A CINA petition . . . shall allege that a child is in need of assistance and shall set forth in clear and simple language the facts supporting that allegation." *Id.* § 3-811(a)(1). Once a CINA petition is filed, a juvenile court "shall hold an adjudicatory hearing," *id.* § 3-817(a), for the purpose of "determin[ing] whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true," *id.* § 3-801(c). At the adjudicatory hearing, the rules of evidence apply and the allegations of the petition must "be proved by a preponderance of the evidence." *Id.* § 3-817(b), (c).

19

Following an adjudicatory hearing, the juvenile court must "hold a separate disposition hearing," either "on the same day as the adjudicatory hearing" or later. *Id.* § 3-819(a). With respect to a child who is alleged to be a CINA arising from abuse or neglect, the court's disposition may entail (1) finding that the child is not a CINA and terminating the case, (2) finding that the child is not a CINA and awarding custody to a noncustodial parent, or (3) finding that the child is a CINA and making a custody determination from among various options. *See generally id.* § 3-819. Depending on the disposition, additional proceedings that are beyond the scope of this opinion follow.[10]

### B. Shelter Care Proceedings

Section 3-815 of the Courts and Judicial Proceedings Article authorizes a local department that believes a child may be a CINA to place the child in emergency shelter care under certain circumstances. As explained further below, shelter care is not a necessary stage in a CINA proceeding but instead is a parallel proceeding to provide interim protection for a child pending completion of the adjudicatory hearing and disposition. Subsection (a) of § 3-815 provides the general authorization for emergency shelter care: "In accordance with regulations adopted by the Department of Human Services, a local department may authorize shelter care for a child who may be in need of

---

[10] The statute imposes on the court a variety of different requirements and tools that must or may be used in connection with the adjudication and disposition of a CINA proceeding, including the right to order that studies be conducted and the obligation to hold periodic review hearings, assess whether the local department has satisfied its obligations, and inquire as to the child's educational stability. Cts. & Jud. Proc. §§ 3-816(a), 3-816.1, 3-816.2, 3-816.4.

20

assistance and has been taken into custody under this subtitle." Subsection (b) then establishes the following parameters:

> (b) A local department may place a child in emergency shelter care before a hearing if:
>
> > (1) Placement is required to protect the child from serious immediate danger;
> >
> > (2) There is no parent, guardian, custodian, relative, or other person able to provide supervision; and
> >
> > (3) (i) 1. The child's continued placement in the child's home is contrary to the welfare of the child; and
> >
> > > 2. Because of an alleged emergency situation, removal from the home is reasonable under the circumstances to provide for the safety of the child; or
> >
> > (ii) 1. Reasonable efforts have been made but have been unsuccessful in preventing or eliminating the need for removal from the child's home; and
> >
> > > 2. As appropriate, reasonable efforts are being made to return the child to the child's home.

Following placement of a child in emergency shelter care, "the local department shall immediately file a petition to authorize continued shelter care." *Id.* § 3-815(c)(1). The court is required to "hold a shelter care hearing on the petition before disposition to determine whether the temporary placement of the child outside of the home is warranted." *Id.* § 3-815(c)(2)(i). Absent good cause, the hearing must "be held not later than the next day on which the circuit court is in session." *Id.* § 3-815(c)(2)(ii). It is such a petition for continued shelter that is at issue here.

21

Subsection (d) provides the criteria for the circuit court to use in determining whether to authorize continued shelter care:

> (d) A court may continue shelter care beyond emergency shelter care only if the court finds that:
>
> > (1) Return of the child to the child's home is contrary to the safety and welfare of the child; and
> >
> > (2)(i) Removal of the child from the child's home is necessary due to an alleged emergency situation and in order to provide for the safety of the child; or
> >
> > > (ii) Reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home.

The duration of a term of shelter care is expressly limited: "A court may not order shelter care for more than 30 days except that shelter care may be extended for up to an additional 30 days if the court finds after a hearing held as part of an adjudication that continued shelter care is needed to provide for the safety of the child." *Id.* § 3-815(c)(4).

## II. THIS COURT HAS JURISDICTION TO REVIEW THE JUVENILE COURT'S SECOND ORDER DENYING THE DEPARTMENT'S REQUEST FOR CONTINUED SHELTER CARE.

Before addressing the parties' respective positions regarding the applicable standard of proof in a shelter care proceeding, we must first address Mother's contention that neither of the Department's appeals are properly before us. Mother moved to dismiss on two grounds: (1) that the juvenile court's December 27 order is moot because it was superseded by the January 10 order; and (2) that neither of the orders is "appealable as a final, collateral, or interlocutory order." We agree with Mother that the December 27 order is moot but we conclude that the January 10 order is appealable under the collateral order doctrine.

22

## A. The December 27 Order Is Moot.

Following the juvenile court's December 27 order, the Department filed an amended CINA petition with a request for continued shelter care. After a magistrate continued shelter care pursuant to the amended petition, the juvenile court held a second de novo hearing and issued the January 10 opinion and order denying continued shelter care. The juvenile court's second order superseded the first. As a result, the first order is moot and "vacating [it] will provide no relief whatever to appellants." *In re Joseph N.*, 407 Md. 278, 303 (2009) (quoting *In re Justin D.*, 357 Md. 431, 444 (2000)); *see also In re Iris M.*, 118 Md. App. 636, 643 (1998) (noting that an initial no-contact order was superseded by a subsequent no-contact order, rendering the first order moot).[11]

## B. The Denial of a Petition for Continued Shelter Care Is Appealable Under the Collateral Order Doctrine.

An order denying continued shelter care is an interlocutory order. Interlocutory orders are ordinarily appealable only in three circumstances: "appeals from interlocutory orders specifically allowed by statute; immediate appeals permitted under Maryland Rule 2-602; and appeals from interlocutory rulings allowed under the common law collateral order doctrine." *Salvagno v. Frew*, 388 Md. 605, 615 (2005). We find the juvenile court's January 10 order falls under the collateral order doctrine exception.[12]

---

[11] To the extent the Department challenges the juvenile court's verbal denial of its request for an ordering controlling the conduct of the parties on December 27, the Department did not renew that request in connection with its amended request for continued shelter care. As a result, that issue is not preserved and we do not consider it.

[12] The Department originally advocated jurisdiction under § 12-303(3)(x) of the Courts and Judicial Proceedings Article, which allows an interlocutory appeal from an

23

The collateral order doctrine "is a very limited exception to the principle that only final judgments terminating the case in the trial court are appealable . . . ." *In re Foley*, 373 Md. 627, 633 (2003). It "treats as final and appealable a limited class of orders which do not terminate the litigation in the trial court." *Id.* (quoting *Bunting v. State*, 312 Md. 472, 476 (1988)). To be appealable under the collateral order doctrine, the order must: (1) "conclusively determine[] the disputed question"; (2) "resolve[] an important issue"; (3) "resolve[] an issue that is completely separate from the merits of the action"; and (4) "be effectively unreviewable if the appeal had to await the entry of a final judgment." *Dawkins v. Balt. City Police Dep't*, 376 Md. 53, 58 (2003) (quoting *Pittsburgh Corning v. James*, 353 Md. 657, 660-61 (1999)). "[I]n Maryland the four requirements of the collateral order doctrine are very strictly applied." *In re Foley*, 373 Md. at 634.

The first, second, and fourth requirements are easily satisfied here. As to the first, the issue to be resolved at a shelter care hearing is "whether the temporary placement of

_____

order "[d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order." However, that applies exclusively to orders depriving *a parent* of custody. *See In re Samone H.*, 385 Md. 282, 315-16 (2005) (noting that an order that does not deprive a mother of custody of her children or detrimentally change her terms of custody is not immediately appealable under § 12-303(3)(x)). When we originally granted in part the Department's first emergency request for an injunction, we concluded that we had jurisdiction under § 12-303(3)(i) and (iii), which allow interlocutory appeals from, respectively, orders "[g]ranting or dissolving an injunction" and "[r]efusing to grant an injunction." We did so based on our conclusion that the juvenile court's order mandating the Department's return of O.P. to his parents constituted an injunction—"an order mandating . . . a specified act," Md. Rule 15-501(a)—and that its order denying the Department's request for continued shelter care was in the nature of the denial of an injunction. Upon further reflection and research, we have concluded that the collateral order doctrine provides a sounder basis for appellate jurisdiction here and so refrain from addressing those other grounds.

24

the child outside of the home is warranted." Cts. & Jud. Proc. §§ 3-801(bb) & 3-815(c). The grounds on which such a placement may be warranted are that not doing so "is contrary to the safety and welfare of the child" and that either removal "is necessary due to an alleged emergency situation and in order to provide for the safety of the child" or "[r]easonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home." *Id.* § 3-815(d). A juvenile court's order denying continued sheltered care conclusively resolves the issue as it returns the child home for the duration of the CINA proceedings, the only period of time at issue.

The second requirement is also satisfied because the issue resolved is an undeniably important one. Denying continued shelter care returns the child to the very situation that the Department contends presents an imminent risk to the child's health and safety.

As to the fourth requirement, a decision to deny continued shelter care is effectively unreviewable on appeal from a final judgment. Because shelter care is designed to provide emergency protection for a child only until a juvenile court rules on the merits of a CINA petition, it will always be moot and effectively unreviewable when the merits are reached. If the juvenile court's shelter care decision was wrong, and the child suffers the harm against which the Department was trying to protect, nothing within any appellate court's power will be able to turn back the clock and place the child in safety during that time period. The nature of the decision makes it unreviewable if not by immediate appeal.

Notably, the fourth requirement of the collateral order doctrine necessarily involves a judgment on "whether delaying review until the entry of final judgment 'would imperil

a substantial public interest' or 'some particular value of a high order.'" *Harris v. State*, 420 Md. 300, 321 (2011) (quoting *Mohawk Indus v. Carpenter*, 558 U.S. 100, 107 (2009)). As discussed further below, the protection of children from imminent risks to their health and safety is a substantial public interest in general and is particularly so in light of the *parens patriae* responsibility of the courts in furthering that interest. Absent a right of immediate appeal, a decision by a juvenile court judge that is contrary to that of a magistrate and to the view of the State agency charged with protecting the health and safety of children would be effectively unreviewable.

Our consideration of the third requirement of the collateral order doctrine—whether the decision "resolves an issue that is completely separate from the merits of the action," *Dawkins*, 376 Md. at 58 (citation omitted)—presents a closer question. The merits of the action here is whether O.P. is a CINA. That requires a determination regarding whether O.P. "requires court intervention because" (1) he "has been abused, has been neglected, has a developmental disability, or has a mental disorder" and (2) his parents "are unable or unwilling to give proper care and attention to [him] and [his] needs." Cts. & Jud. Proc. § 3-801(f). As set forth above, the decision as to whether a child is a CINA happens in two separate proceedings, the adjudicatory hearing and the disposition hearing, and the outcome, if the Department is successful, is to work toward a long-term arrangement focused on providing the child a healthy, stable, and permanent arrangement.

A request for continuation of shelter care frequently accompanies a CINA petition, but it is neither a necessary step in a CINA proceeding nor does it constitute part of the

26

CINA determination. Although the facts relevant to a determination of whether to authorize continued shelter care and whether a child is a CINA may substantially overlap, the issues in the two proceedings are fundamentally distinct. The core issue in a shelter care proceeding is whether there is an impending risk to the health and safety of a child— from whatever source and for whatever reason—if the child is returned home before the court can complete the disposition phase of a CINA proceeding. *Id.* § 3-815(d). The resolution of that issue will determine where and with whom the child will reside prior to the adjudication of the merits of the CINA petition. The core issues in a CINA proceeding, by contrast, are (1) whether the child has been abused or neglected and whether his or her parents or guardians are unwilling or unable to care for him or her, and (2) if so, what plan the court will approve for permanency for the child subsequent to the adjudication and disposition of the CINA petition. *Id.* §§ 3-801(f); 3-819(b).

The unique nature of shelter care proceedings informs our conclusion that an order denying continued shelter care is completely separate from the merits of a CINA proceeding for purposes of the collateral order doctrine. Because a hearing must be held on a petition for continued shelter so soon after a local department places a child in emergency shelter care, the Rules of Evidence do not apply at the hearing. Md. Rule 11-112(d). As a result, as in this case, much of the evidence that is submitted can be based on hearsay that would be inadmissible in any subsequent proceeding. The purpose of a shelter care hearing is thus not to gather evidence for either side to prove its ultimate case, nor is such a hearing a necessary step on the path to an adjudicatory hearing or disposition.

27

Instead, it is parallel to and separate from the proceedings that ultimately lead to the CINA decision. That distinguishes the orders resulting from such proceedings from others that our appellate courts have found not to constitute appealable collateral orders.

In *Harris v. State*, for example, the Court of Appeals declined to extend the collateral order doctrine to include an order granting the State's discovery request for medical records, including competency evaluations, in a murder trial. 420 Md. at 318. The discovery request aimed to uncover critical facts that could be outcome determinative in a competency hearing, the resolution of which would ultimately affect the merits of the trial. *Id*. at 319. The Court noted that "[i]f an order decides an issue merely as a step toward final disposition of a prosecution, it is interlocutory; however, if it disposes of a separable branch of the case, it is an appealable final judgment." *Id.* at 320 (quoting *Sigma Reprod. Health Ctr. v. State*, 297 Md. 660, 666 (1983)). A competency hearing, although "a distinct phase of a criminal trial," is "'a step toward the final disposition of a prosecution.'" *Harris*, 420 Md. at 320 (quoting *Sigma*, 297 Md. at 666). Here, by contrast, a ruling on continuation of shelter care is a "separable branch of the case," not a step on which other steps build.

Similarly, in *In re Samone*, the Court of Appeals declined to treat an order denying a mother's motion for an independent evaluation to determine whether a bond existed between her and her children as an appealable collateral order. 385 Md. at 316 n.13. There, the children had been adjudicated CINA and, after a periodic review hearing, were placed on a permanency plan of adoption. *Id.* at 288. Before an annual review hearing, the mother

28

filed a motion for an independent clinical study to assess her relationship with the children and to determine whether removal of the children from foster care would be harmful. *Id.* at 291. The trial court denied the mother's motion and reaffirmed the adoption permanency plan. *Id.* at 296. Although the primary focus of the Court's opinion was on whether the order was appealable under § 12-303(3)(x) of the Courts and Judicial Proceedings Article—and the Court found it was not, *id.* at 316—the Court also concluded that the order was not appealable under the collateral order doctrine. *Id.* at 316 n.13. Addressing the third prong of that doctrine, the Court concluded that the order was "not completely separate from the merits of the action because such studies are one factor that the court relies upon to assess child placement." *Id.*

Here, the shelter care determination is not a "step toward the final disposition" of a CINA proceeding. Shelter care runs its course not in the path of the CINA adjudication, but collaterally, in its own lane, without advancing or hindering the final CINA decision. That, combined with its conclusive resolution of an important issue that is effectively unreviewable on direct appeal, renders it among the narrow class of orders reviewable under the collateral order doctrine.

## III. THE COURT MUST FIND, BY A PREPONDERANCE, THE FACTORS REQUIRED TO CONTINUE SHELTER CARE.

As a matter of first impression, we must determine what standard of proof a juvenile court must use in determining whether to authorize continued shelter care. Here, the juvenile court used a preponderance of the evidence standard. Father argues that the juvenile court got the standard right. The Department and O.P. contend that the court must

29

apply a lower standard: either reasonable under the circumstances or reasonable grounds to believe that continuation of shelter care is warranted. Mother advocates for a clear and convincing standard. We begin our analysis, as we must, with the plain language of the statute.

## A. Statutory Construction

"When we construe a statute, we search for legislative intent." *Bell v. Chance*, 460 Md. 28, 53 (2018). Our "primary guide" in that search is the statutory text. *Id.* "We begin our analysis by looking to the normal, plain meaning of the language of the statute." *Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 682 (2018) (quoting *Shealer v. Straka*, 459 Md. 68, 84 (2018)). We "read[] the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Id.* We also read the plain language "within the context of [its] statutory scheme," and "consider[] the purpose, aim, or policy of the Legislature in enacting the statute . . . ." *Espina v. Jackson*, 442 Md. 311, 322 (2015) (quoting *Bd. of County Comm'rs v. Marcas, LLC*, 415 Md. 676, 685-86 (2010)). We must also "check our interpretation against the consequences of alternative readings of the text. Throughout this process, we avoid constructions that are illogical or nonsensical, or that render a statute meaningless." *Bell*, 460 Md. at 53 (internal citation omitted).

The provision we are construing is § 3-815(d) of the Courts and Judicial Proceedings Article, which provides:

> (d) A court may continue shelter care beyond emergency shelter care only if the court finds that:

30

(1) Return of the child to the child's home is contrary to the safety and welfare of the child; and

(2)(i) Removal of the child from the child's home is necessary due to an alleged emergency situation and in order to provide for the safety of the child; or

> (ii) Reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home.

The parties do not dispute *what* the juvenile court must find before it may authorize continued shelter care. The statute spells that out in subsubsections (d)(1) and (d)(2). Nor do the parties dispute that it is the local department's burden to prove those things.[13] The question at the center of their dispute is the standard by which the juvenile court must find those things.

The statute provides that a court may continue shelter care "only if it finds" the conditions listed in the statute. In arguments that are grounded more in policy than the language of the statute, the Department and O.P. argue that this language does not mean that the court need find that those things are true—even by the standard of more likely than not—but that it need only conclude that there is a reasonable possibility that they might be true. Our analysis here is guided by that of the Court of Appeals in *Volodarsky v. Tarachanskaya*, 397 Md. 291 (2007). There, the Court analyzed a different statute, but one that similarly balances considerations relating to the health and safety of children with the fundamental liberty interests of parents in raising their children.

---

[13] The Department, however, does argue that if it carries the burden of showing continued shelter care would be "reasonable under the circumstances," the burden would "then shift[] to the parents to demonstrate the child will be safe if returned home."

In *Volodarsky*, the Court of Appeals explored the standard of proof to be applied in determining whether abuse or neglect had occurred in the context of § 9-101 of the Family Law Article. *Id.* at 292. Under that statute, if a "court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding," the court is not permitted to give custody or unsupervised visitation to that party unless it "specifically finds that there is no likelihood of further child abuse or neglect by the party." Md. Code Ann., Fam. Law § 9-101. The question in *Volodarsky* was by what standard of proof a court must make the initial finding that abuse or neglect has occurred so as to give rise to the obligation to make the subsequent finding. The circuit court in that case recognized that there was evidence that the child had been "exposed to sexual behavior," but the court was not "convinced by a preponderance of the evidence that [the child had] been the victim of sexual abuse, or that her father [had] perpetrated sexual abuse." *Id.* at 302. This Court reversed, determining that the correct standard was not preponderance, but, as specified in the statute, "reasonable grounds to believe" that abuse or neglect had occurred. *Id.* at 293.

The Court of Appeals determined that, in the context of § 9-101, there is no tension between the application of a preponderance standard and the statute's "reasonable grounds to believe" language. *Id.* at 304. That, the Court held, is because the statutory language "requir[ing] a specific finding that '*further* abuse or neglect' is not likely clearly implies that there must be some sort of finding or determination by the court that abuse or neglect likely occurred in the first instance." *Id.* For that to be true, the Court observed, the earlier

32

finding must have been made by, at a minimum, a preponderance of the evidence standard.[14]  *Id.* at 308.  Anything else would not be a finding at all.

In reaching this conclusion, the Court drew extensively from *Addington v. Texas*, 441 U.S. 418 (1979), in which "the Supreme Court set forth the function of a standard of proof and explained the three standards that exist."  *Volodarsky*, 397 Md. at 304.  "The function of a standard of proof," noted the Court, "as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. "  *Id.* at 305 (quoting *Addington*, 441 U.S. at 423).

Quoting *Addington*, the Court of Appeals described the standard of proof at "the low end" of the spectrum as "a mere preponderance of the evidence," which is the standard used in "the typical civil case involving a monetary dispute between private parties, the outcome of which is of minimal concern to society."  *Volodarsky*, 397 Md. at 305 (quoting *Addington*, 441 U.S. at 423).  When using that standard, the parties "share the risk of error

---

[14] We note that we are concerned here with what it means for a court to "find" something, not with what it means for "reasonable grounds" to exist.  In *Volodarsky*, the Court of Appeals read "reasonable grounds," in the context of § 9-101, to require a preponderance standard only because of the later reference in the same statute to the court "find[ing]" something else, which the Court concluded necessarily implies a preponderance standard.  Later in the same year that it decided *Volodarsky*, the Court concluded that "reasonable grounds" can, in other contexts, refer to a standard that is well short of preponderance.  *See Motor Vehicle Administration v. Shepard*, 399 Md. 241, 258-59 (2007) (concluding, in context of statute authorizing police officer to pull over a driver suspected of driving under the influence, that "reasonable grounds means less than probable cause.  *Ipso facto*, it does not mean preponderance of the evidence.").

in roughly equal fashion." *Id*. "The intermediate standard, of clear, cogent, or convincing evidence, is used in cases, such as fraud, quasi-criminal wrongdoing, or 'to protect particularly important individual interests in various civil cases' where the interest at stake is 'deemed to be more substantial than mere loss of money.'" *Volodarsky*, 397 Md. at 305 (quoting *Addington*, 441 U.S. at 424). The highest standard, beyond a reasonable doubt, applies to cases that "are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Volodarsky*, 397 Md. at 305 (quoting *Addington*, 441 U.S. at 423). The Supreme Court, the Court of Appeals observed, did "not even contemplate[]" a standard of proof lower than a preponderance of the evidence. *Volodarsky*, 397 Md. at 305.

From this, the Court of Appeals reasoned that it could not possibly be the case that a court's "finding," especially in the context of § 9-101, could be premised on a standard lower than preponderance: "It defies logic and reason to permit a court to make what is essentially a finding of fact, especially one that may lead to the deprivation of a Constitutionally-based right of access to one's child, when the court is unable to find, even by the slimmest margin, that the fact is more likely so than not." *Id.* at 305-06. In other words, for a court to "find" something, it must be persuaded to at least some minimal extent that that thing is true.

Particularly notable for our purposes is the Court's analysis in *Volodarsky* distinguishing situations in which a trial court is called upon to make a finding of fact as to

which it must be persuaded and other situations in which a trial court is called upon only to determine whether certain objective circumstances are identified that, if true, would be legally sufficient. The preponderance standard is not required for an objective analysis "in situations in which only a preliminary determination need be made, based on incomplete and often non-testimonial hearsay evidence," such as in considering whether there is probable cause to issue a warrant. *Id.* at 306. In that case, "the issuing magistrate usually takes the affidavit offered in support of the application at face value and determines only whether the facts alleged are legally sufficient to establish probable cause." *Id.* "The magistrate is normally not required to make ultimate credibility determinations or weigh the ultimate persuasiveness of the averments in the affidavit and, unless the application or documents offered in support of the application are deficient or suspiciously ambiguous, usually has no basis for doing so." *Id.* at 306-07. Section 9-101 determinations, by contrast, are not probable cause determinations. The "ultimate factual decisions are made by a judge based on conflicting testimonial evidence." *Id.* at 307. Thus, "[i]t is by using the preponderance standard that the judge determines whether reasonable grounds exist." *Id.* at 308; *see also In re Yve S.*, 373 Md. 551, 587 (2003) ("The burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under § 9-101(b).").

A decision under § 3-815(d) falls somewhere in between the finding required by § 9-101 of the Family Law Article and a magistrate's probable cause determination. On one hand, a decision under § 3-815(d) is only preliminary and

may be based on evidence, including hearsay, that could not be introduced in a proceeding in which the Rules of Evidence apply. On the other hand, the court need not assume the facts presented by the local department are true and it is able to make at least some credibility determinations. Unlike a probable cause determination in which the court has only the allegations written in the warrant application, a juvenile court assessing whether to continue shelter care receives evidence from both sides and, at least when the evidence is in dispute, "the court must receive testimony as to the material, disputed allegations." *In re Damien F.*, 182 Md. App. 546, 584 (2008).

In that context, we find both the procedure the statute requires and its language governing the decision the juvenile court must make to be particularly instructive. As to procedure, the General Assembly did not simply provide for a juvenile court to review the allegations in a petition to determine whether, if true, they would justify a continuation of shelter care. Instead, the statute requires the juvenile court to hold a hearing that, absent good cause, must take place "not later than the next day on which the circuit court is in session." Cts. & Jud. Proc. § 3-815(c)(2)(ii). That hearing, as noted, is an adversarial one in which parents are able to challenge through cross-examination the evidence presented by the local department and, even more significantly, present their own evidence. *Damien F.*, 182 Md. App. at 583. Indeed, in *Damien F.*, this Court found that a juvenile court that refused to permit parents to present evidence to dispute the local department's allegations based on a belief that a shelter care hearing is analogous to a probable cause determination made a "serious error" and "misconstrued the nature of a shelter care hearing." *Id.*

36

The General Assembly's choice of language to identify the juvenile court's role is equally clear: "A court may continue shelter care beyond emergency shelter care *only if* the court *finds that . . . .*" (emphasis added). This language requires the court not to defer to or assume the truth of allegations in a petition, but to actually find—in other words, as *Volodarsky* instructs, to be at least slightly persuaded as to the truth of—the things the statute specifies. Moreover, by stating that the juvenile court may continue shelter care "only if" it makes those findings, the language makes clear that the juvenile court lacks discretion to continue shelter care in the absence of making those findings. To conclude, as the Department and O.P. advocate, that the juvenile court *must* order continued shelter care if the evidence persuades the court only of a reasonable possibility that a return home would be contrary to the child's health and safety, without regard to whether the court believes it likely to be true, would require us to ignore the language chosen by the General Assembly.[15]

This conclusion accords with the common understanding of what it means to "find" something as reflected in legal and popular dictionaries. Black's Law Dictionary defines find as: "To determine a fact in dispute by verdict or decision." *Black's Law Dictionary*, "find," at 749 (10th ed. 2014). Merriam–Webster similarly defines find as: "to determine

_____

[15] To be sure, the findings required by § 3-815(d) are preliminary. Both parties are generally at only the preliminary stage of gathering and understanding the evidence, rendering the record presented at such a hearing necessarily incomplete and so generally inadequate to serve as a basis for ultimate factual determinations. That, however, does not dictate that we can ignore the General Assembly's choice of language requiring that the juvenile court actually be persuaded by the "slimmest margin," *Volodarsky*, 397 Md. at 305, as to the likely correctness of those facts before authorizing continued shelter care.

37

and make a statement about." *Merriam-Webster's Collegiate Dictionary* "find," at 469 (11th ed. 2014); *see also New Oxford American Dictionary*, "find," at 647 ("ascertain (something) by study, calculation, or inquiry" or "officially declare to be the case"). These definitions support our conclusion that the requirement that the court "find" certain things to be true must necessarily mean that the court must be persuaded that it is more likely than not that those things are true.

Our conclusion from plain language is also consistent with case law in other contexts, which provides that in the absence of an explicit statement that a different standard of proof applies, a court's findings are ordinarily made by a preponderance standard. *See, e.g.*, *Coleman v. Anne Arundel County Police Dep't*, 369 Md. 108, 129 (2002) (noting that "the preponderance of the evidence standard is generally applied in civil cases") (quoting *Everett v. Balt. Gas and Elec. Co.*, 307 Md. 286, 301 (1986)); *Wills v. State*, 329 Md. 370, 373-74 (1993); *Mathis v. Hargrove*, 166 Md. App. 286, 310 n.5 (2005); *Attorney Grievance Comm'n of Maryland v. Ward*, 394 Md. 1, 16 (2006); *see also* 2 McCormick on Evid. § 339 (7th ed.) ("According to the customary formulas a party who has the burden of persuasion of a fact must prove it in criminal prosecutions 'beyond a reasonable doubt,' in certain exceptional controversies in civil cases, 'by clear, strong and convincing evidence,' but on the general run of issues in civil cases 'by a preponderance of evidence.'").

Thus, by its plain language, § 3-815(d) precludes a juvenile court from continuing shelter care unless the court is persuaded, by the evidence presented at a shelter care

hearing, that it is at least more likely than not that (1) returning home is contrary to the child's safety and welfare and (2) removal is necessary due to an alleged emergency and to provide for the child's safety, or reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal.

That, however, is not the end of our analysis, because our construction of this statute must "consider[] the purpose, aim, or policy of the" General Assembly. *Espina*, 442 Md. at 322. That is particularly so here, where both sides of the dispute claim that important policy-based interests that the General Assembly intended to protect in the statute counsel interpretations in their favor. Indeed, both sides are correct, as this case presents a clash of competing interests of the highest order—the State's *parens patriae* interest in protecting children from harm and the fundamental liberty interest of parents in raising their children. Moreover, both sides are also correct that the General Assembly had as an expressly-identified purpose of Subtitle 8 the protection of each of these interests, among others:

> (1) To provide for the care, protection, safety, and mental and physical development of any child coming within the provisions of this subtitle;
> . . .; [and]
> (3) To conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare; . . . .

*Id.* § 3-802(a).

Because these competing interests push in opposite directions, we discuss each of them in turn to determine whether our plain language interpretation of § 3-815(d) is in keeping with the public policy purposes of the General Assembly, or whether a different interpretation or imposition of a "judicial gloss" is warranted. *See Koshko v. Haining*, 398

39

Md. 404, 426-27 (2007) (reading additional requirements into the grandparent visitation statute as a "judicial gloss" to bring it "into compliance with constitutional principles").

### B.     The Fundamental Liberty Interest of Parents

"The proper starting point for legal analysis when the State involves itself in family relations is the fundamental constitutional rights of a parent." *In re Yve S.*, 373 Md. at 565. The Fourteenth Amendment of the United States Constitution protects parents' right to raise their "children as [they] see[] fit, without undue interference by the State." *Id.* "The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life." *In re Mark M.*, 365 Md. 687, 705 (2001). Maryland courts have "consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one . . . ." *In re Yve S.*, 373 Md. at 566; *see also In re Adoption/Guardianship Nos. CAA92–10852 & CAA92–10853*, 103 Md. App. 1, 12 (1994) ("This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions."). "This liberty interest provides the constitutional context which looms over any judicial rumination on the question of custody or visitation." *Koshko*, 398 Md. at 423.

We view this right to be so fundamental that it "cannot be taken away unless clearly justified." *In re Mark M.*, 365 Md. at 705 (quoting *Boswell v. Boswell*, 352 Md. 204, 218 (1998)). "The Legislature and the Supreme Court have both expressed the view that children should not be uprooted from their family but for the most urgent reasons." *In re Jertrude O.*, 56 Md. App. 83, 99 (2003) We have recognized that "depriving a parent of

custody of a child is a drastic measure that should only be taken when necessary for the welfare of the child." *In re Joseph G.*, 94 Md. App. at 350. Thus, "[t]he fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution." *Id.* at 351 (quoting *In re Jertrude O.*, 56 Md. App. at 100).

This fundamental right gives rise to a presumption "that it is in the child's best interest to be placed with a parent." *In re Yve S.*, 373 Md. at 566, 572; *see also Koshko*, 398 Md. at 423-24 ("Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.") (quoting *Monroe v. Monroe*, 329 Md. 758, 781 n.4 (1993) (Eldridge, J. concurring)). "If it were otherwise, the most disadvantaged of our adult citizens always would be at greater risk of losing custody of their children than those more fortunate. Those of our citizens coping with emotional or mental difficulties could be faced with such discrimination." *In re Yve S.*, 373 Md. at 571. "This presumption is premised on the notion that 'the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display.'" *Koshko*, 398 Md. at 424 (quoting *Melton v. Connolly*, 219 Md. 184, 188 (1959)).

The statutory recognition of the fundamental nature of this right is reflected not only in the statement of the express purpose of the State in § 3-802(3), but in requirements such

as the provision of counsel at State expense to indigent parents "at every stage of the proceedings" pursuant to § 3-813, *In re Damien F.*, 182 Md. App. at 568, and the requirement to hold an immediate hearing on shelter care, with notice to the parents, after the local department removes a child, Cts. & Jud. Proc. § 3-815(c) & Md. Rule 11-112(a).

We recognize that the temporary deprivation of custody of one's children pursuant to a shelter care order is less intrusive to a parent's fundamental liberty interest than is a permanent or long-term deprivation of custody. However, that difference is one of degree only and "is not a difference of constitutional magnitude." *Koshko*, 398 Md. at 430. Temporarily removing a child from a parent's custody for weeks or months undoubtedly "intrudes upon the fundamental right of parents to direct the 'care, custody, and control' of their children." *Id.*

### C.     The Court's *Parens Patriae* Responsibility to Protect Children

Our courts have been equally clear that as important an interest as parents have in raising their children, it is not absolute. "One need not wander far into the thickets of family law before running into situations and circumstances where application of an absolute right of the parent would fail to produce a just result." *In re Yve S.*, 373 Md. at 568. Due process demands the balancing of all of the competing interests involved in the litigation, and, in the context of family law, "the State's interest is to protect the child's best interests as *parens patriae*." *Id.* at 569 (quoting *Wolinski v. Browneller*, 115 Md. App. 285, 300 (1997)). The doctrine of *parens patriae* emanates from the "State's interest in protecting the health, safety, and welfare of its citizenry." *Id* at 569. Pursuant to that

doctrine, "the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves." *In re Mark M.*, 365 Md. at 705. A juvenile court thus possesses "wide discretion concomitant with [its] 'plenary authority to determine any question concerning the welfare of children within [its] jurisdiction.'" *Reichert v. Hornbeck*, 210 Md. App. 282, 305 (2013) (quoting *Bienenfeld v. Bennett-White*, 91 Md. App. 488, 503 (1992)).

Therefore, "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *In re Mark M.*, 365 Md. at 706 (quoting *Boswell v. Boswell*, 352 Md. 204, 219 (1998)); *see also In re Adoption/Guardianship No. 10941*, 335 Md. 99, 113 (1994) (noting that "the controlling factor . . . is . . . what best serves the interest of the child"). "That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent." *In re Mark M.*, 365 Md. at 706. A child's welfare is a "compelling state interest," *Koshko*, 398 Md. at 426, that "is a consideration that is of transcendent importance when the child might . . . be in jeopardy." *In re Najasha B.*, 409 Md. 20, 33 (2009) (quoting *In re Mark M.*, 365 Md. at 705-06).

"The broad policy of the CINA Subtitle is to ensure that juvenile courts (and local departments of social services) exercise authority to protect and advance a child's best interests when court intervention is required." *In re Najasha B.*, 409 Md. at 33. Thus, "where abuse or neglect is evidenced, particularly in a CINA case, the court's role is

necessarily more pro-active." *Id.* at 34 (quoting *In Re Mark M.,* 365 Md. at 706); *see also*

*In re Mark M.*, 365 Md. at 706 ("[C]ourts have a higher degree of responsibility where

abuse is proven."). The juvenile court has a "clear and continuous supervisory role to play"

in CINA proceedings. *In re Najasha B.*, 409 Md. at 39 (quoting *In re Justin D.*, 357 Md.

431, 449 (2000)). In such cases, a juvenile court "acting under the State's *parens patriae*

authority, is in the unique position to marshal the applicable facts, assess the situation, and

determine the correct means of fulfilling a child's best interests." *In re Mark M..*, 365 Md.

at 707.

### D.    Returning to Our Statutory Construction

After considering these two fundamental interests—both compelling in their own

right, both expressly identified as purposes of the statutory scheme, and both pulling in

opposite directions—we are unable to conclude that either should cause us to deviate from

our interpretation of the plain language of the statute. "[W]e are duty bound to strike a

balance between the State's compelling interest to do all that it can to protect children from

child abuse and neglect, while at the same time recognizing the fundamental right of a

parent to raise his or her child." *In re Damien F.*, 182 Md. App. at 579-80 (internal citations

omitted).

Although the Department and O.P. are undoubtedly correct that courts have an

obligation to be vigilant and proactive in protecting the health and safety of children who

have no way to protect themselves, the preponderance standard contained in the statute is

not inherently inconsistent with that role, especially when viewed in the context of the

countervailing interest of parents who face being deprived of at least weeks of custody of their children. *See Volodarsky*, 397 Md. at 305-06. The preponderance of the evidence standard requires proof "that something is more likely so than not so. In other words . . . such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in [one's] mind[] a belief that it is more likely true than not true." *Weisman v. Connors*, 76 Md. App. 488, 502 (1988). Although it weighs slightly against the party with the burden of proof, that is a light thumb on the scale for a standard that in large measure "share[s] the risk of error" among the parties "in roughly equal fashion." *Voladarsky*, 397 Md. at 305 (quoting *Addington*, 441 U.S. at 423).

The Department and O.P. contend that applying the preponderance standard to shelter care hearings will make it more difficult to protect children who are at risk. However, a local department that has placed a child in emergency shelter care must already have made a determination that doing so "is required to protect the child from serious immediate danger" and that "[t]here is no parent, guardian, custodian, relative, or other person able to provide supervision." Cts. & Jud. Proc. § 3-815(b)(1) & (2). The local department must also have concluded either (1) that "continued placement in the child's home is contrary to the welfare of the child" and that removal is "reasonable under the circumstances" because of an alleged emergency situation or (2) that reasonable efforts to prevent or eliminate the need for removal have been unsuccessful and reasonable efforts to return the child home are being made. *Id.* § 3-815(b)(3). At a shelter care hearing, the local department is able to convey the bases for its own conclusions on these points to the

45

court without the restrictions of the Rules of Evidence. It is not unreasonable to expect that the same information that has persuaded the local department of the need to act, if effectively conveyed, should also be sufficient to persuade a court that it is more likely necessary than not.

Moreover, we expect juvenile courts assessing whether they are persuaded by a local department's presentation of evidence to be cognizant of the circumstances and limitations under which that presentation is being made. Courts should not have unreasonable expectations of the local department's ability to (1) present live testimony from fact or expert witnesses with minimal or no notice, (2) marshal documentary evidence that may yet be unknown to it or outside of its control in a matter of hours or days, or (3) have reached fully-articulated causal analyses of injuries that may have only recently come to light and still be under investigation. Preponderance of the evidence is a standard that is far short of certainty. It does not demand that a court know anything to be true, only that it reach a conclusion—preliminary in the context of a shelter care hearing—as to what is more likely than not the case after accounting for the totality of the information presented, including both what is known and what is not, and the reasonable inferences that may be drawn from both.

Mother advocates for the more stringent standard of clear and convincing evidence based on the risk to the fundamental liberty interest of parents. Her arguments, however, fail to take proper account of the countervailing interest in the health and safety of the children. Application of the clear and convincing standard at the shelter care stage would

render the State almost completely helpless to protect some children. Moreover, the local department is only required to prove its case at the CINA adjudicatory hearing by a preponderance of the evidence. Cts. & Jud. Proc. § 3-817(c). It would be illogical to interpret the statute to impose on a local department the obligation to prove its case by clear and convincing evidence at the shelter care stage—when it may only have had a matter of hours to begin to assemble and process information—and then reduce that standard to a preponderance a month later.

The Department and O.P. find support for their "reasonable" standards in the provisions of the statute defining when a local department may place a child in emergency shelter care. In making that argument, they rely on the reference in § 3-815(b)(3) to "an alleged emergency situation" in which "removal from the home is *reasonable under the circumstances* to provide for the safety of the child." (emphasis added). We find that reference inapplicable for several reasons, most prominently: (1) it is contained only in the subsection of the statute identifying when a local department may initiate emergency shelter care, and is thus notably absent two subsections later addressing a court's ability to "continue shelter care beyond emergency care," *id.* § 3-815(d); and (2) even in its own subsection, it applies only to one of several factors that must exist before the local department may place a child in emergency shelter care.

Each party also alleges that the unique nature of the shelter care hearing—having to occur immediately following placing a child in emergency shelter care; with neither party generally having access to complete information; and not being subject to the Rules of

Evidence—puts it at a disadvantage that merits a standard of proof that is more favorable to it. Although we do not rule out that one party or the other will be placed at a greater disadvantage in this procedure in individual cases, we do not expect that the disadvantage will always fall on one side. In any event, our decision here is controlled by existing statutory language that requires a juvenile court to "find" the existence of certain conditions before it is permitted to continue shelter care. Advocates for a different standard may look to the General Assembly for a change.

## IV. THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE PETITION FOR CONTINUED SHELTER CARE AS TO O.P.

Turning finally to the facts of this case, we address the claims of the Department and O.P. that the juvenile court abused its discretion when it denied the Department's petition for continued shelter care of O.P. The Department, O.P., or both also contend that the court erred in finding that (1) a medical expert was available to the Department as a witness at the shelter care hearing, (2) the delay in getting medical care for O.P. did not put him at "risk of danger," (3) the parents were credible witnesses, (4) the lack of information about the timing of O.P.'s injuries was dispositive, (5) O.P.'s head was growing "abnormally large" while in the NICU, and (6) the Department did not make reasonable efforts to prevent O.P.'s removal from his home. Although we disagree with some of the juvenile court's comments, we conclude that the court (1) did not clearly err as to the findings on which it based its ultimate decision and (2) did not abuse its discretion as to that ultimate decision. We address the factual findings first and then the court's ultimate conclusion.

48

## A.     The Juvenile Court's Challenged Factual Findings

The Department and O.P. contend that the court clearly erred in several of its factual findings. First, O.P. and the Department contend that the juvenile court erred in finding that a medical expert, Dr. Goldstein, was available to the Department as a witness at the second de novo shelter care hearing. To the extent the court's statements indicate an expectation that the Department should have had Dr. Goldstein physically present in the courtroom, we agree with the Department and O.P.'s criticism. In circumstances in which a witness is outside the control of a local department, including a medical professional with responsibilities to other patients, it is unreasonable for a court to expect a local department to be able to produce that witness at a shelter care hearing on short notice and even more unreasonable for a court to penalize the local department for failing to do so. We reject that aspect of the juvenile court's criticism of the Department.

But we also view the juvenile court's criticism to be broader than the Department's failure to have Dr. Goldstein physically present in the courtroom. The de novo shelter care hearing that commenced on January 8 was the second in this case and it followed the first by nearly two weeks. The Department was aware well before the hearing that the juvenile court had found Mr. Kay's description of Dr. Goldstein's statements and conclusions inadequate to support continued shelter care, especially with respect to Mr. Kay's testimony that (1) Dr. Goldstein could not provide any timeline as to when O.P. sustained his injuries, (2) based on his discussion with Dr. Goldstein, O.P.'s injuries could have occurred while in the NICU, (3) Dr. Goldstein did not say what else the injuries might be

49

"consistent" with; (4) the bulging veins on O.P.'s forehead that were identified as part of the problem that presented on December 14 had also been present while O.P. was in the NICU, and (5) he had a writing stating Dr. Goldstein's conclusion that O.P.'s injuries were consistent with abusive head trauma, but he failed to bring it to court.

These were significant points, going to the heart of the Department's contention that the injuries demonstrated a need for protection, that seemingly begged for clarification. Mr. Kay might have misunderstood Dr. Goldstein, the basis for Dr. Goldstein's conclusion that the injuries were consistent with abusive head trauma, or even what it means when a doctor says that injuries are "consistent" with something. But the Department did not present any evidence suggesting that anyone went back to ask Dr. Goldstein for any clarification, response, or additional information during the nearly two weeks between hearings. The juvenile court found it difficult to understand why, as do we. If someone had sought clarification, any new information could have been presented by hearsay testimony or affidavit. We do not find it clearly erroneous, under these circumstances, for the court to have questioned the absence of additional information emanating from Dr. Goldstein or another medical professional.[16]

Second, O.P. and the Department also challenge the juvenile court's finding that "there was no evidence" that the parents' delay in seeking medical attention for O.P.

---

[16] We pause to make the obvious point that the opportunity to seek clarification that presented itself here will not be present during most shelter care hearings. Thus, a local department's inability to clarify on the spot a concern raised in a shelter care hearing will not, by itself, ordinarily constitute a fair criticism of a local department's case.

between the December 10 incident in which he choked and momentarily stopped breathing and his December 14 visit to the pediatrician "in any way harmed the child." Although O.P. showed up at the pediatrician's office on December 14 with concerning growth in his head circumference and other symptoms, no witness—including Mr. Kay—made any connection between those injuries and the incident on December 10. Nor do the records of the emergency medical personnel who responded on December 10 indicate that they identified any abnormalities with O.P.'s head.[17] If there was a connection between those two things, it was not made at either hearing. The juvenile court's factual finding that there was an absence of evidence to support a causal connection between the delay in seeking attention and any of O.P.'s injuries is not clearly erroneous.

Third, O.P. also argues the juvenile court clearly erred in finding the parents credible given the contradictions between their testimony and the evidence presented. We disagree. The juvenile court found "both parents to be completely credible," particularly with respect to their accounts of the events "and most especially their concern and caring for an infant with multiple medical challenges." In their testimony, Mother and Father addressed the inconsistencies in their prior statements. For example, Mother admitted that in her original

---

[17] The evidence presented to the court as to the December 10 incident, and particularly the involvement of the responding emergency personnel, was mixed. Although the records of the emergency medical personnel reflect that they advised the parents to seek medical evaluation and that the refusal of their offer to transport O.P. to the emergency room at that time was against medical advice, the records also reflect that the "Primary Impression" of the responding medical personnel was that O.P. had no apparent illness or injury and that they found him "crying normally, in no apparent distress with good skin color." In light of that, we do not find *clearly* erroneous the court's finding that Mother's explanation of her behavior was credible.

account of the December 10 incident, she "had [her] dates mixed up." She also explained that her lack of distress upon learning that O.P. had temporarily stopped breathing was because the same thing had happened twice at the hospital and was caused by O.P.'s laryngomalacia. To be sure, there were reasons to doubt the testimony of the parents. They originally claimed the choking/not breathing incident occurred on December 12, when it actually occurred on December 10—a significant difference when considering the gravity of the incident and the delay in seeking medical care. There were also some differences in the accounts given by Mother and Father of that incident and what is reflected in the narrative provided by the EMS personnel (although those differences are not as stark as the Department claims). But the juvenile court, which had the opportunity to observe the witnesses as they testified, believed the accounts and explanations provided by Mother and Father. "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *Fone v. State*, 233 Md. App. 88, 115 (2017) (quoting *Larocca v. State*, 164 Md. App. 460, 471-72 (2005) (in banc)). "[W]e give 'due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and significantly, its opportunity to observe and assess the credibility of witnesses.'" *Id.* Recognizing that deference, we find no clear error in the court's credibility determinations.

Fourth, the Department argues that the juvenile court also clearly erred by "fail[ing] to recognize that the lack of information on the timing of O.P.'s injuries was due to the preliminary nature of the shelter care hearing." Unfortunately for the Department, the testimony of its own witness could at least reasonably be construed to the contrary.

Mr. Kay testified at the first hearing that the Department "really tried to get as much of an understanding" as it could regarding the timing of the brain injuries, "but [Dr. Goldstein] said medical technology does not allow them to put any dates, whether it was, you know, two weeks old, two months old [f]or either of the bleeds." In other words, Mr. Kay's testimony was that medical science was incapable of determining when the injuries occurred, not that the doctors needed more time to do so. Although the Department attempts to undermine Mr. Kay's credibility on that point by noting that he is a lay witness without medical training, (1) he was the Department's only witness; and (2) in the almost two weeks between shelter care hearings, the Department apparently did not develop any new information to clarify or correct his earlier testimony. On this record, we find no clear error in the circuit court's reliance on the testimony of the Department's witness.

Fifth, the Department argues that the court "made an unsupported factual finding that O.P.'s head 'was growing abnormally large' while he was in the NICU." However, as Mother points out, and as discussed above, the growth chart she submitted into evidence shows that while O.P. was in the NICU, his head circumference went from the 50th percentile to above the 97th percentile.[18] Although the Department points out that the growth of O.P.'s head then stabilized for a three-week period, (1) the majority of that period

_____

[18] The growth chart relied on by Mother is specifically for prematurely-born infants and is based on gestation age. Other information in the medical records seems to be consistent at least with the conclusion that by the time he was discharged, O.P.'s head was large in comparison to the rest of his body. For example, on November 27, just a few days after O.P. was discharged, his head circumference was in the 20th percentile for all babies (presumably based on birth age, not gestation age), while his weight and length were below the first percentile.

53

occurred after O.P. left the NICU and (2) it does not alter the fact that, according to the chart, O.P.'s head grew at a faster-than-normal rate during his stay in the NICU. We find no clear error in this factual finding.

Sixth, the Department also challenges the court's finding that the Department did not make reasonable efforts to prevent O.P.'s removal from his home. The basis for the court's finding was that when it was told that medical personnel believed O.P.'s injuries "were due to non-accidental trauma," the Department abandoned a safety plan it had been developing that would have required the parents' interactions with O.P. to be supervised by O.P.'s maternal grandfather, who lived in the same household. Although the juvenile court concluded that the Department had not proven the need for continued shelter care to its satisfaction, there is no indication anywhere in the record that the Department was proceeding in bad faith or that it did not genuinely believe that O.P.'s injuries were the result of non-accidental trauma that had taken place in the home in which O.P. lived with his parents and grandfather. Once it came to that belief, it was certainly not unreasonable for the Department to second-guess a safety plan that would have left supervisory responsibilities with one of the individuals who "could also be a possible cause of the head trauma." The juvenile court clearly erred in finding otherwise. However, it does not appear that this error affected the result, which was based primarily on the court's conclusion that the Department failed to prove by a preponderance of the evidence that O.P.'s injuries were non-accidental or caused by the parents.

54

**B. The Juvenile Court Did Not Abuse Its Discretion in Rendering Its Ultimate Conclusion Denying Continued Shelter Care.**

The juvenile court's ultimate conclusion denying shelter care is reviewed for an abuse of discretion, which occurs only when a juvenile court's decision is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *In re Adoption/Guardianship of C.A. & D.A.*, 234 Md. App. 30, 45 (2017) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 313 (1977)).

On this record, and affording proper deference to the factual determinations and ultimate decision of the juvenile court, we cannot say the court's denial of shelter care was "well removed from any center mark" or "beyond the fringe" of what this Court "deems minimally acceptable." *Id.* The Department presented its case through a single witness whose testimony conceded that (1) O.P.'s injuries could have been sustained while in the NICU and (2) medical science was not capable of proving otherwise. A different factfinder might have been skeptical of both concessions, but neither was contradicted and the court was entitled to credit them. The same witness testified that he had received written confirmation from a doctor that the injuries were consistent with abusive head trauma but failed to (1) provide the confirmation or (2) articulate what that meant with respect to the doctor's level of confidence that there had been abusive head trauma while O.P. was in the care of his parents. The court also received evidence that O.P.'s head had grown significantly faster than normal while in the NICU and that the protruding veins observed in his forehead on December 14 had also been present while in the NICU. Moreover, the

55

court believed the parents, including their explanation for their conduct between December 10 and 14, which was at least partially supported by records of the responding emergency medical personnel indicating that upon arrival they found O.P. in good health and with no apparent injury or illness.

Taking this and the rest of the evidence presented into account, the court found itself unpersuaded of those things it was required to find: that O.P.'s return home would be contrary to his safety and welfare and that removal of O.P. from his home was necessary because of an emergency situation and to provide for his safety. Although the record certainly contained sufficient information for a reasonable factfinder to have reached the opposite conclusion, in light of the evidence presented, we cannot say that the juvenile court's conclusion here was so far "beyond the fringe" as to constitute an abuse of discretion.

> **ORDER OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**